IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

| | | |
|---|---|---|
| Dewain Teasley, | ) | C/A No. 8:24-cv-01347-DCC-WSB |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| United Parcel Service, Inc., Aubary Farmer, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter is before the Court on United Parcel Service, Inc. ("UPS") and Aubary Farmer's ("Farmer") (collectively "Defendants") Motion for Summary Judgment and Motion for Judgment on the Pleadings pursuant to Federal Rules of Civil Procedure 56 and 12(c). ECF Nos. 63; 76. Dewain Teasley ("Plaintiff") brings this action against Defendants alleging employment discrimination under Title VII and 42 U.S.C. § 1981. ECF No. 19. Pursuant to 28 U.S.C. § 636(b)(1)(A) and Local Civil Rule 73.02(B)(2)(g) (D.S.C.), the undersigned United States Magistrate Judge is authorized to review all pretrial matters in employment discrimination cases and submit findings and recommendations to the district court.

**BACKGROUND**

Plaintiff filed the Complaint in the South Carolina Court of Common Pleas in Anderson County on January 12, 2024. ECF No. 1-1. Defendants removed the case on March 20, 2024. ECF No. 1. On May 24, 2024, Plaintiff filed the Amended Complaint. ECF No. 19. The Amended Complaint asserts eight numbered Causes of Action against Defendants: (1) race discrimination under South Carolina law and Title VII of the Civil Rights Act of 1964 ("Title VII"), (2) retaliation under South Carolina law and Title VII, (3), age discrimination under South Carolina law and the

Age Discrimination in Employment Act ("ADEA"), (4) race discrimination under 42 U.S.C. § 1981 ("§ 1981"), (5) retaliation under § 1981, (6) racially hostile work environment under § 1981, (7) retaliation under the Family and Medical Leave Act ("FMLA"), and (8) defamation.

On November 25, 2024, Defendants filed a motion for partial judgement on the pleadings. ECF No. 36. ("First Motion for Judgment of the Pleadings"). After briefing was completed, the Court issued a Report and Recommendation which recommended that the First Motion for Judgment on the Pleadings be granted in part. ECF No. 47 ("First R&R"). On September 17, 2025, the district judge adopted the First R&R, in part. ECF No. 75. As a result, state law claims for discrimination and retaliation in the first three Causes of Action were dismissed, as well as the Title VII and ADEA claims in the first three Causes of Action against Farmer. *Id*. at 3. The remaining claims after this Order are: (1) race discrimination under Title VII against UPS, (2) retaliation under Title VII against UPS, (3), age discrimination under the ADEA against UPS, (4) race discrimination under § 1981, (5) retaliation under § 1981, (6) hostile work environment under § 1981, (7) retaliation under the FMLA, and (8) defamation regarding a March 2022 incident.

Defendants filed the Motion for Summary Judgement, with supporting memorandum and exhibits, on May 30, 2025. ECF No. 63. Plaintiff filed a Response in Opposition to the Motion for Summary Judgment, with supporting exhibits, on July 7, 2025. ECF No. 67. On July 24, 2025, Defendants filed a Reply.

Defendants also filed another motion for partial judgement on the pleadings on October 1, 2025. ECF No. 76 ("Second Motion for Judgment on the Pleadings"). On October 15, 2025, Plaintiff filed a Response in Opposition to the Second Motion for Judgment on the Pleadings. ECF No. 77. Defendants filed a Reply regarding the Second Motion for Judgment on the Pleadings on

October 22, 2025.  The Motion for Summary Judgment and Second Motion for Judgement on the Pleadings are fully briefed and ripe for consideration.

## FACTS

UPS is a worldwide package delivery and logistics company that is incorporated in Ohio and operates a facility in Anderson, South Carolina (the "Anderson center").  *See* ECF No. 63-51, Exh. 27, Farmer Decl. ¶¶ 2-3.  Farmer, who is Caucasian and over the age of 40, is a Business Manager at the Anderson center.  *Id.* ¶ 4.  Plaintiff, who is African American and over the age 40, is a former package car driver who worked at the Anderson center.  *Id.*

**Employment History**

Plaintiff originally began employment with UPS as a temporary seasonal helper during UPS's peak season and was later hired as a preloader on February 3, 2014.  *See* ECF No. 63-6, Exh. 5, Employee History Profile at 2-3, 6-7.  In May 2016, Plaintiff was promoted to a full-time package car delivery driver position.  *Id.* at 6-7.  From January 2021 until the end of his employment, Plaintiff directly reported to On-Road Supervisor Thomas Thorton ("Thorton"), who is Caucasian and under the age of 40.  *See* ECF Nos. 63-51, Exh. 27, Farmer Decl. ¶ 4; 63-52, Exh. 28, Thorton Decl. ¶ 2.  Thorton reported to Farmer.  ECF No. 63-51, Exh. 27, Farmer Decl. ¶ 4. Farmer reported to Division Manager Emanuel Yarrell, an African American over the age of 40, who had also overseen Farmer's predecessor, Quinton Mills ("Mills"), an African American over the age of 40.  *Cf.* ECF No. 63-7, Ex. 6a, Disc. Ntcs. (pre-Sept. 2020) at 2 (showing the Business Manager's and Division Manager's signatures on disciplinary notices issued against Plaintiff). Mills was the Business Manager of the Anderson center until Farmer joined the Anderson center in September 2020.  ECF No. 63-51, Exh. 27, Farmer Decl. ¶ 4.

**Collective Bargaining Agreement And Disciplinary History**

UPS maintains policies for reporting alleged workplace harassment, including harassment based on protected classes such as race, age, or disability. *See generally* ECF Nos. 63-2, Exh. 1, Pol'y Book; 63-3, Exh. 2, Code Bus. Conduct; 63-4, Exh. 3, Prof'l Conduct Pol'y. UPS's non-supervisory operations employees, who are mostly unionized and covered under a collective bargaining agreement ("CBA"), have an additional avenue to address workplace conditions, including for alleged workplace harassment. *See* ECF No. 63-5, Exh. 4, CBA, art. 36 at 38. That avenue is a grievance-arbitration process during which the employee is represented by the Teamsters Union ("Teamsters"). *See id.* art. 8 at 12-21. The CBA sets forth other contractual rights for bargaining unit employees, including seniority, pay, and discipline. *See generally* ECF No. 63-5, Exh. 4, CBA.[1]

The CBA does not permit covered bargaining unit employees to be discharged without "just cause." ECF No. 63-5, Exh. 4, CBA, art. 50 at 76-78. Under the CBA, there are "working termination notices" and "cardinal sin discharges." *Id.*; ECF No. 63-49, Exh. 25, Hungerford Decl. ¶ 7. A working termination notice occurs when a supervisor advises an employee that he will be terminated, if upheld by the grievance process, for ordinary just cause, such as attendance issues. ECF Nos. 63-5, Exh. 4, CBA, art. 7 at 12-13, art. 50 at 76-78; 63-49, Exh. 25, Hungerford Decl. ¶ 7. "Just cause" for a working termination notice requires a sufficient reason to discharge an employee beyond what is ordinarily required for at-will employment. ECF Nos. 63-5, Exh. 4, CBA, art. 7 at 12-13, art. 50 at 76-78; 63-49, Exh. 25, Hungerford Decl. ¶ 7. An employee with a working termination notice continues working for ten days and, if he timely files a union grievance,

---

[1] Plaintiff was a bargaining unit employee while he was a package car driver, and, between "sometime" in 2018 and May 2021, he also served as a "shop steward" for the local Teamsters. ECF Nos. 63-51, Exh. 27, Farmer Decl. ¶ 4; 67-1, Exh. 1, Pl. Aff. ¶ 4.

he continues working until the grievance is resolved.  ECF Nos. 63-5, Exh. 4, CBA, art. 7 at 12-13, art. 50 at 76-78; 63-49, Exh. 25, Hungerford Decl. ¶ 7.  In contrast, a cardinal discharge involves more severe or egregious misconduct, such as dishonesty or drinking on the job, and the termination takes effect immediately.  ECF Nos. 63-5, Exh. 4, CBA, art. 7 at 12-13, art. 50 at 76-78; 63-49, Exh. 25, Hungerford Decl. ¶ 7.  If an employee grieves a cardinal discharge, the employee is entitled to reinstatement only if the grievance is settled or resolved in the employee's favor.  ECF Nos. 63-5, Exh. 4, CBA, art. 7 at 12-13, art. 50 at 76-78; 63-49, Exh. 25, Hungerford Decl. ¶ 7.

Before Farmer joined the Anderson center in September 2020, Mills had issued Plaintiff multiple disciplinary notices for various conduct and performance issues, including harassment policy violations and failure to follow procedures.[2]  *See generally* ECF No. 63-7, Ex. 6a, Disc. Ntcs. (pre-Sept. 2020).  These disciplinary notices issued by Mills placed Plaintiff at the heightened stage of UPS's progressive discipline process prior to Farmer's involvement.  *Id.*

Under the CBA, Plaintiff filed grievances over some the disciplinary notices that he received.  ECF No. 63-49, Ex. 25, Hungerford Decl. ¶ 8.  As is not unusual, UPS and Teamsters agreed to reduce many of Plaintiff's disciplinary notices.  *Id.*  As a result, Plaintiff was able to work continuously for UPS throughout 2017 to 2020 while only losing two days of pay.  ECF No.

---

[2] Plaintiff submits that he received four disciplinary notices in 2018, he did not receive any disciplinary notices in 2019, he received a three-day suspension for failure to follow methods and procedures in 2020, and he was involved in three minor accidents which only involved property damage in 2020.  ECF No. 67-1, Exh. 1, Pl. Aff. ¶ 3.  The record before the Court for disciplinary notices provided to Plaintiff as One (1) in 2016, One (1) in 2017, Five (5) in 2018, none in 2019, and Seven (7) in 2020.  ECF No. 63-7, Ex. 6a, Disc. Ntcs. (pre-Sept. 2020). The Court does not need to resolve the apparent dispute over the exact number of disciplinary notices in each year, it is sufficient that the parties do not dispute that Plaintiff had a significant number of disciplinary notices both before and after Farmer became his supervisor.

63-49, Ex. 25, Hungerford Decl. ¶ 8; *see generally* ECF No. 63-36, Exh. 12, Excerpts from Plaintiff's Hours History (showing 2 days of Code 28 for time served as an unpaid suspension). This occurred despite the fact that Plaintiff had also received three working termination notices in 2020 for getting into avoidable accidents. ECF Nos. 63-8, Exh. 6a1, Accident 1 (Mar. 10); 63-9, Exh. 6a2, Accident 2 (Aug. 21); 63-11, Ex. 6b2, Accident 3 (Dec. 16).

Between February 2, 2021 and May 7, 2021, Farmer issued multiple working termination notices to Plaintiff:[3]

- February 9, 2021 - DOT card absent during methods ride. ECF No. 63-12, Exh. 6c1, Feb. 9, 2021 Discipline.

- February 25, 2021 - failing to deliver all packages. ECF No. 63-13, Exh. 6c2, Feb. 25, 2021 Discipline.

- April 9, 2021 - driving around UPS's property, and then leaving for his route, with the back door of the package car open. ECF No. 63-14, Exh. 6c3, Apr. 9, 2021 Discipline.

- April 29, 2021 - running a stop sign, leaving packages unsecured, and not recording a lunch break. ECF No. 63-15 Exh. 6c4, Apr. 9, 2021 Discipline.

- May 7, 2021 - failing to follow proper methods when delivering to apartment complexes. ECF No. 63-16, Exh. 6c5, May 7, 2021 Discipline.

---

[3] Plaintiff submits that he received six disciplinary notices between February 2, 2021 and April 29, 2021. ECF No. 67-1, Exh. 1, Pl. Aff. ¶ 3. Plaintiff further states that prior to Farmer becoming the business manager of the Anderson center, Plaintiff had never received that many disciplinary actions in a year and "certainly not in three months." *Id.* As noted in footnote 2, the Court does not need to resolve any possible dispute over the exact number of disciplinary notices in each year.

Plaintiff filed grievances covering these five disciplinary notices, which UPS and Teamsters agreed to reduce to a ten-day unpaid suspension and a last chance agreement in settlement of the disciplinary notices.[4]  ECF No. 63-17, Exh. 6c6, Last Chance and Stlmt. Agmt. Under the last chance agreement, Plaintiff agreed to maintain an "acceptable work record," including by following all UPS methods, procedures, instructions and conducting himself in a professional manner at all times.  *Id.* at 3.  Plaintiff further agreed that failure to maintain such an acceptable work record would result in his immediate termination from UPS.  *Id.*  Plaintiff submits that Teamsters Representative Charley Brooks told him that he would lose his job if he did not sign the last chance agreement and resign as shop steward.  ECF No. 67-1, Exh. 1, Pl. Aff. ¶ 6. Prior to this time, Plaintiff had never heard of a last chance agreement and was not aware of any other employee at UPS who had been required to sign such an agreement.  *Id.*  Plaintiff did not receive any further disciplinary notices between May and September 2021.  ECF No. 63-1 at 4.

**Dog Bite Packet**

In early February 2021, Plaintiff took issue regarding the dissemination of a dog bite pocket card depicting a dark-skinned man being attacked by a dog following an incident where a package car driver was bitten by a dog.  *See* ECF Nos. 67-8, Exh. 8, Pl. Dep. at 124:2:130:25; 62-47, Exh. 23, Dog Bite Pocket Card & Metadata.  Plaintiff testified that after a safety meeting regarding the dog attack incident, Defendants distributed the dog bite pocket card, which Plaintiff found to be a "not-so-subtle attempt to harass and retaliate against him for his previous complaints to Farmer." ECF No. 67-8, Exh. 8, Pl. Dep. at 128:15-129:15.  When the dog bite pocket card was presented to Plaintiff during his deposition and he was asked to explain how the policy was offensive and

---

[4] Plaintiff submits that he also agreed to resign as shop steward in May 2021, apparently in connection with the settlement of his 2021 disciplinary notices and entering into the last chance agreement.  ECF No. 67-1, Exh. 1, Pl. Aff. ¶ 6.

humiliating, Plaintiff stated that the dog bite policy was disseminated after a "very bad" dog attack involving a driver and helper that caused severe injury and almost cost the driver his job. *Id.* at 129:16-130:7. Plaintiff explained that he was "very vocal" in trying to protect the victims' jobs "and do it the right way and no one get injured." *Id.* Plaintiff further states that "the depiction of a black man with a dog biting him on his buttocks, you asked me how that was offensive? I apologize that you don't know what it's like to be a black man in America and look at this, miss, and ask me, how was that offensive?" *Id.* at 130:8-13. When asked again to clarify how the dog bite card was offensive, Plaintiff goes on to state, "It's a black man getting bit by a dog. Do you know the majority of the center is white? Why didn't they put a white driver there ...." *Id.* at 130:21-131:8. When asked whether the image would have been offensive if the person depicted had been a different race, Plaintiff stated, "[a]nd then at the bottom it says, 'Watch your back'. You're correct. It wouldn't have been offensive." *Id.* at 131:9-12. Defendants submit that the dog bite policy was created in 2007 and previously distributed between 2007 and 2010. *See* ECF No. 63-47, Exh. 23, Dog Bite Pocket Card & Metadata at 4 (showing that the file was created and last modified on October 17, 2007); 63-51, Exh. 27, Farmer Decl. ¶ 17.

**Disputes with Management**

On March 10, 2021, Thorton signed a grievance that Plaintiff filed complaining about Defendants' failure to provide Plaintiff a "methods ride" that Plaintiff had requested in an effort to have Defendants, who were disciplining him for failure to adhere to proper methods, "re-educate" him to avoid such discipline. ECF Nos. 63-52, Exh. 28, Thorton Decl. ¶¶ 9-10; 67-8, Exh. 8, Pl. Dep. 142: 2-6, 18-19. Plaintiff testified that Thorton signed the grievance and threw it back at him. ECF No. 67-8, Exh. 8, Pl. Dep. at 142:18-21. The grievance hit the floor, Thorton picked it up, and then threw it onto a table. *Id.* at 142:21-24. Thorton declared that he simply signed the

grievance quickly and was in a rush to get on with the day, causing the grievance to fly off the table.  ECF No. 63-52, Exh. 28, Thorton Decl. ¶ 10.

Around this time, Plaintiff began surreptitiously recording conversations with Farmer and other employees.  *See*, *e.g.*, ECF Nos. 63-51, Exh. 27, Farmer Decl. ¶ 25; 63-29, Exh. 7, Rec. #1; 63-30, Exh. 8, Rec. #2.  On April 2, 2021, Plaintiff recorded a conversation between Plaintiff and Farmer concerning Plaintiff being disciplined for violating UPS's anti-harassment policy in relation to an incident where an employee at the Anderson center believed that he had been underpaid.  *See generally* ECF No. 63-29, Exh. 7, Rec. #1.  The recording of this conversation proceeds as follows.  In the beginning of the video, Plaintiff is heard telling coworkers, "This is going to end up in court, I'm telling you."  ECF No. 63-29, Exh. 7, Rec. #1 at 00:25-00:28.  Once Plaintiff enters a room with Farmer, Farmer states, "I am not going to allow you or anyone else to create a hostile or negative work environment."  *Id.* at 01:19-01:31.  Farmer continues, "I am not going to allow you to create a hostile and negative work environment for any of my employees, my management team, or myself.  Will not happen."  *Id.* at 01:34-01:46.  Plaintiff replies, "What are you referring to … because as a steward it is my responsibility to inform.  Now are you telling me that I can't, as a steward … you're telling me that I cannot do my job as a steward and tell these guys their rights."  *Id.* at 01:47-02:04 (cleaned up).  Farmer responds, "I am not telling you that at all," and Plaintiff replies, "So what are you saying then?"  *Id.* at 02:05-02:08.  Farmer explains, "There's a difference between telling somebody their rights and trying to strongarm your fellow employees into doing something against their will, trying to strongarm your fellow employees … into telling them that they are not to help management, trying to strongarm your fellow employees in telling them that they should do things against following the processes, procedures and methods.  Also, you're not going to walk around here and you're not going to call my management team

racist." *Id.* at 02:09-2:47 (cleaned up).  Plaintiff protests these statements and then Farmer asks, "Did you tell [UPS employee] that he didn't correct a man's pay because he was black?"  *Id.* at 03:00-03:08.  Plaintiff clarifies, "No I did not, I did not tell your manager he did it because he was black, I asked him did he do it because he was black."  *Id.* at 3:08-03:19 (cleaned up).  Farmer then states, "We take care of our employees across the board. I do not care if they are purple with pink polka dots, white, black whatever … I take care of my employees across the board."  *Id.* at 03:24-03:35.  Plaintiff then questions, "Fairly and equally?", which Farmer affirms.  *Id.* at 03:36-03:39.  Farmer then states, "Here's how it's moving forward.  Like it, hate it, don't really care. It's gonna be UPS policy.  You will follow other avenues.  If you think I'm a racist.  If I am whatever you think I am.  There are other avenues that you can follow in a professional manner. And I approve, I prefer those, because it gives me the right to counter those with libel and slander. And that gives me, and trust me, trust me, outta the two of us …."  *Id.* at 03:39-04:18 (cleaned up). Plaintiff responds, "So what you tryna imply, you smaller[5] than me."  *Id.* at 04:20-04:24.  Farmer cuts Plaintiff off, "Stop, stop one second."  *Id.* at 04:27-04:29.  Farmer then states, "The last time I had a conversation … about the way you talk to me … I said it would not happen again," and goes on to read a document stating, "[Plaintiff] has continued to create a hostilely and racially charged working environment [in relation to the allegations that another UPS employee was not paid correctly because he was black] … [cites UPS policies and anti-harassment policy] …. Violations of these policies moving forward will result in further discipline including and up to termination."  *Id.* at 5:30-06:00 (cleaned up).  Plaintiff protests that Farmer is implying that Plaintiff and fellow UPS employees should not exercise their rights, "So as a steward, don't inform

---

[5] This word in the conversation is unclear.  Neither party identifies what word was specifically said, but the undersigned hears "smaller" when reviewing the recording.  However, in context, the word could be "smarter".

members of their rights right?" *Id.* at 06:32-06:36. Farmer responds, "Nope, I didn't say that. In fact, I said the complete opposite of that." *Id.* at 06:37-06:40. "As a union steward you should make sure that your employees understand their rights per this contract and per UPS policy. And you should do that, as a union steward. And, on top of that, as a union representative, you should not, should not, create a hostile work environment." *Id.* at 06:55-7:25. Plaintiff states, "I believe in equality and I believe in fairness…. It is not equality and fairness what you are doing here…. And like you said you can prove it, I can too…. We both gonna have the chance, and you know we will, to prove our cases." *Id.* at 08:25-08:43. Farmer starts responding with, "Do not create a negative and hostile work environment …," and Plaintiff interrupts, "That didn't start until you got here…. This is not your business, UPS's building." *Id.* at 08:44-08:55. Farmer then states, raising his voice a bit, "I got …," then collects himself, "I am the top ranking UPS representative in this building …. I am stocking this company, because I am stocking this company, because I am the representative, this is my building, those are my package cars, y'all are my employees. I am responsible for all of the above. I am responsible for the work environment, and I will maintain that responsibility." *Id.* at 08:55-09:23. Plaintiff quips, "Thank you for telling me you are responsible for the working environment, that's great." *Id.* at 09:25-09:28. Farmer concludes, "Thank you, I appreciate y'all, be safe," and the parties end on some pleasantries. *Id.* at 09:29-09:37.

The parties dispute the proper characterization of this conversation. Defendants submit that in the conversation, Plaintiff repeatedly mis-paraphrased Farmer's statements to antagonize and incite Farmer, trying to bait him into agreeing with Plaintiff that Farmer was violating the law. ECF Nos. 63-51, Exh. 27, Farmer Decl. ¶ 25; 63-29, Exh. 7, Rec. #1. Defendants also submit that during the conversation, Farmer gave Plaintiff a documented verbal warning for violating UPS's

anti-harassment policy and admonished Plaintiff for creating a racially hostile work environment by coercing a co-worker, who is African American, into raising a baseless wage complaint. ECF No. 63-29, Exh. 7, Rec. #1 at 2:01-3:20. Plaintiff suggested loudly, disruptively, and publicly that the supervisor did not pay the co-worker because he is Black. *Id*. Defendants also submit that Plaintiff falsely claimed that Farmer discouraged informing employees of their rights, insinuating that discriminatory acts were permitted. *Id.* at 01:54-02:14, 06:34-6:45.

Plaintiff characterizes the conversation differently. Plaintiff disputes that he attempted to antagonize and incite Farmer and tried to bait him. ECF No. 67 at 1. Plaintiff also disputes that he loudly, disruptively, and publicly made inappropriate comments about the alleged discrimination. *Id.* at 2. Plaintiff submits that the recording shows that Farmer told him that Plaintiff was not to make accusations of racism against Farmer or anyone else on Farmer's management team and that if Plaintiff charged Farmer with race discrimination, then no one would believe Plaintiff and everyone would believe Farmer. ECF No. 67-1, Exh. 1, Pl. Aff. ¶ 9. Plaintiff also declared that Farmer's tone of voice was authoritative and threatening. *Id.* Plaintiff highlights that Farmer can be heard telling Plaintiff that "I am not going to allow you or anyone else to create a hostile or negative work environment. Okay? I'm not going to allow you to create that hostile and negative work environment for any of my employees, my management team, or myself. Will not happen." ECF No. 63-29, Exh. 7, Rec. #1 at 01:19-01:31. Plaintiff also notes that Farmer later stated that he needed to preserve his rights to "counter [Plaintiff's accusations] with libel and slander." *Id.* at 03:39-04:18. Plaintiff further submits that Farmer unambiguously sent a clear message that Farmer had the power to fire Plaintiff, and that Farmer would do so, as a result of Plaintiff engaging in protected activities and communications with other employees. ECF No. 67 at 6.

Plaintiff also contends that on an unknown date, Natasha Moss ("Moss") who worked in the human resources department, told Plaintiff that she overheard Farmer in a conversation and that she said Farmer was "racist as hell." *See* ECF No. 67-8, Exh. 8, Pl. Dep. at 224:1-12. [6] Plaintiff testified that, based on Moss's statement, Farmer was making racist statements and comments when the package car drivers leave the building. *Id.* at 224:15-18. Plaintiff also testified that he did not know what was said, including that he did not know what words Farmer may have said. *Id.* at 224:19-23.

Also on an unknown date, Thorton misplaced Plaintiff's AirPods. *See* ECF No. 67-8, Exh. 8, Pl. Dep. at 224:24-225:24. Plaintiff testified that he asked Rose, a nighttime "OMS," whether anyone had turned in any AirPods. *Id.* at 225:2-4. Rose contacted Thorton, then told Plaintiff that Thorton had them and to go upstairs and get them. *Id.* at 225:2-11. Once Plaintiff went upstairs to see if Thorton had the AirPods, Thorton could not find them. *Id.* at 225:12-17. Thorton declared that he did not take Plaintiff's AirPods. *See* ECF No. 63-52, Exh. 28, Thorton Decl. ¶ 20. Thorton maintains that the AirPods were found in a package car by a car wash employee and that Thorton put them in a desk drawer in "our on-road supervisor office" so that he could hopefully return them to their, then unknown, owner. *Id.* The AirPods "disappeared" at some point after. *Id.* Thorton assumed that their owner had come in and taken them from the drawer in the unlocked office but does not know what happened to them. *Id.* However, Thorton maintains that he did not take them for himself. *Id.*

---

[6] No affidavit or deposition testimony from Moss is in the record.

**Route Changes**

In June 2021, Farmer "cut" Plaintiff's bid route[7] and assigned Plaintiff to a new route covering Oconee County, the next county over from Plaintiff's bid route. ECF No. 67-8, Exh. 8, Pl. Dep. at 143:16-144:14. Plaintiff asserts that Farmer assigned Plaintiff the new, unfamiliar route hoping that Plaintiff would miss a delivery and thus lead to discipline. *Id.* at 143:24-144:14. Plaintiff supported this assertion by testifying that before he left that morning, he requested a map from Thorton and Farmer, who both refused to provide Plaintiff with a map and told him to "go buy a map." *Id.* at 144:15-20. Plaintiff testified that a week prior, Jason Bowen, a Caucasian over the age of 40, asked Thorton and Farmer for a map, and they provided Bowen with a map because he was on a new area of Anderson with which he was unfamiliar. *Id.* at 144:20-25. Plaintiff also testified that he had the most seniority on the "loop" and identified another package car delivery driver, John Davis ("Davis"), a Caucasian under the age of 40, who had less seniority than him and drove on a route adjacent to Plaintiff's route.[8] *Id.* at 144:6-14. On the other hand, Farmer declared that, as business manager, he has to account for the fluctuating volume of packages to deliver and sometimes adjust certain routes. ECF No. 63-51, Exh. 27, Farmer Decl. ¶ 8. Farmer maintains that any time he has made adjustments to routes, such decision was based on legitimate, business factors and permissible under the CBA. *Id.* Farmer also declared that adjusting delivery routes occurs commonly and that such adjustments affect drivers of different races and ages,

---

[7] Although the parties do not define what a "bid route" is, based on the excerpts of the CBA provided, a bid route appears to be a preferred route selected annually by bargaining-unit drivers and are selected based on seniority. *See* ECF No. 63-5, Exh. 4, CBA at 59-62 (recognizing bid routes).

[8] It is unclear based on Plaintiff's testimony whether he is complaining that his route reassignment is problematic based on Davis's lesser seniority with respect to the June 2021 route reassignment. ECF No. 67-8, Exh. 8, Pl. Dep. at 143:16-144:14.

drivers who have never requested or taken leave under the FMLA, and drivers who have been connected to the filing of grievances. *Id.*

In October 2021, Farmer cut Plaintiff's Monday bid route, assigned him a different route, and assigned Davis the majority of Plaintiff's Monday bid route. ECF No. 67-8, Exh. 8, Pl. Dep. at 146:6-15, 148:17-25. Plaintiff testified that he was entitled to his bid route based on his seniority, that there were no exceptions to bid rights during peak seasons, and that once a driver bids on a route, the driver stays on the bid route for a year.[9] *Id.* at 146:20-147:3. Plaintiff also testified that Farmer's decision was discriminatory because Plaintiff had higher seniority than Davis, and that instead, Davis should have been assigned the route that Plaintiff was assigned. *Id.* at 148:17-25. Defendants submit that, to deliver an exceptionally high volume of packages over the annual holiday season, UPS hires temporary seasonal drivers and driver helpers starting at the beginning of peak season, typically around October each year. ECF No. 63-51, Exh. 27, Farmer Decl. ¶ 26. In October 2021, unlike other drivers, Plaintiff refused to work with a helper[10] and was thus unable to cover as many delivery stops. ECF No. 63-27, Exh. 6d2, 65-22 to 79-22 Pre-Hrg. And Comp. Stmts. at 9. As a result of Plaintiff's refusal to work with a helper, Plaintiff's assigned Monday route, consisting of approximately one hundred stops, was reassigned to adjoining routes. ECF No. 63-51, Exh. 27, Farmer Decl. ¶ 26. Drivers other than Davis also

---

[9] Plaintiff also testified that Defendants could not "pull" him off his bid route according to the CBA but does not point to a specific provision of the CBA. ECF No. 67-8, Exh. 8, Pl. Dep. at 147:1-3. The undersigned has reviewed the excerpts from the CBA and found no support for this portion of his testimony. *See generally* ECF No. 63-5, Exh. 4, CBA.

[10] Plaintiff refused to work with a helper unless it was proved that the helper had received full COVID vaccination. ECF No. 63-51, Exh. 27, Farmer Decl. ¶ 26. Farmer told Plaintiff that he could not inquire about vaccination status and offered Plaintiff an accommodation by asking if Plaintiff would work with a helper if the helper wore a mask. *Id.* Plaintiff still refused, so Farmer assigned him to a route that did not require or greatly benefit from a helper. *Id.*

received portions of Plaintiff's Monday bid route, some with greater seniority than Plaintiff, so he did not raise an objection as to the more senior drivers. *Id.* Farmer submits that this type of reassignment was typical, especially for drivers who have lower seniority, like Plaintiff, and especially during peak season. *Id.* Notably, the route reassignment did not result in a cut to Plaintiff's hours or pay. *See generally id.* ¶¶ 8, 23, 26; ECF No. 63-36, Exh. 12, Hours Hx.

### Working Termination

On October 18, 2021, Plaintiff received another working termination. ECF No. 63-18, Exh. 6c7, Oct. 18, 2021 Discipline. Plaintiff submits that, on October 11, 2021, he returned from delivering packages to the Anderson center and sent a message through his DIAD board asking management to audit his truck. ECF No. 67-1, Exh. 1, Pl. Aff. ¶ 10. When Plaintiff arrived, he told Thorton that there was a package on his truck that should have been delivered the previous Friday. *Id.* Plaintiff submits that he had not driven the truck on the previous Friday so the package not being delivered was not an error on his part. *Id.* Plaintiff submits that while Thorton was auditing the truck, Plaintiff noticed a second package that should have been delivered that day, on October 11, but had been overlooked. *Id.* Plaintiff asked Thorton if he could deliver the second package. *Id.*[11] However, Thorton instructed another available driver, Cody Burrell ("Burrell"), to make the delivery due to UPS policy.[12] *Id.*; ECF No. 63-52, Exh. 28, Thorton Decl. ¶ 14. Plaintiff submits that he is aware of other instances where package car drivers failed to deliver a package

---

[11] Defendants submit that Plaintiff was unable to find a package in his car for four days. ECF No. 63-31, Exh. 9, Plaintiff Dep. at 151:6-153:13. Plaintiff disputes that he failed to deliver a package for four days. ECF No. 67-1, Exh. 1, Pl. Aff. ¶ 10. However, there is no dispute that Plaintiff failed to deliver the second package.

[12] Defendants submit that missed deliveries are presumed to be dishonest because drivers scan and complete deliveries in real time, so any missing package should be immediately detected. ECF Nos. 63-51, Exh. 27, Farmer Decl. ¶ 27; 63-52, Exh. 28, Thorton Decl. ¶ 14.

and were not issued any discipline because of it. ECF No. 67-1, Exh. 1, Pl. Aff. ¶ 11. For example, sometime in 2020, while Plaintiff was a shop steward, package car driver Mike Hicks ("Hicks") missed delivery on a package and went home without realizing the mistake. *Id.* Hicks called Plaintiff and said that Mills called him and told him to either return to the center to deliver the package or face discipline.[13] *Id.* Hicks was allowed to deliver the package that night without receiving any discipline. *Id.* Similarly, Burrell testified that he has missed a delivery "a handful of times." *See* ECF No. 67-7, Exh. 7, Burrell Dep. at 28:4-13, 29:3-10. Burrell also testified that when he realized that he missed a package after returning to the center, that he notified a supervisor, who then told Burrell to go back out and deliver the package. *Id.* at 28:4-10.

Other UPS employees also submitted statements and testimony regarding discipline for missing a package. *See* ECF Nos. 67-5, Exh. 5, Mack Aff.; 67-6, Exh. 6, Sparks Dep. Don Mack ("Mack"), a recently retired employee of the Anderson center, declared that he missed deliveries but was never disciplined accordingly. *See* ECF No. 67-5, Exh. 5, Mack Aff. ¶ 6. Jeffery Sparks ("Sparks"), another former employee, testified that he had been disciplined for missing a package, but also that it happens often and that he knew other package car drivers have missed packages. ECF No. 67-6, Exh. 6, Sparks Dep. at 17:1-25. When asked what the disciplinary action was, Sparks testified, "It ranges…. there were progressive discipline rules … in place." *Id.* at 17:12-22. Sparks explained, "If it happens every single day, then I'm sure eventually – at the end of the month, if you have missed 30 packages, yes, there's gonna be progressive discipline…. If not, something happens one or two times and you are able to fix it, then it may be a hey, do better, you know, next time, here's a warning for progressive discipline." *Id.*

---

[13] Plaintiff submits that he spoke to Mills, who confirmed this conversation. ECF No. 67-1, Exh. 1, Pl. Aff. ¶ 11.

**Dispute with Management Over Chemical Spill**

In early November 2021, there was a chemical spill in Plaintiff's package car.  ECF Nos. 63-52, Exh. 28, Thorton Decl. ¶ 15; 67-8, Exh. 8, Pl. Dep. 66:25.  Plaintiff testified that he called Thorton several times to tell him that the chemical spill occurred, but Thorton would not come out to bring Plaintiff the proper personal protective equipment to clean up the spill.  ECF No. 67-8, Exh. 8, Pl. Dep. 66:25-67:8.  Plaintiff testified that, a week prior to the spill, a different driver[14] called Thorton and told him that a chemical spill occurred, and that Thorton went out to bring the driver a chemical spill kit.  *Id.* at 67:9-11.  Plaintiff on the other hand had to go to the store and purchase the materials to clean up the spill himself.  *Id.* at 67:11-18.  Thorton eventually called Plaintiff back, screaming and yelling at Plaintiff, to which Plaintiff responded, "You're calling me on my own personal time, on my own personal phone.  Do not call me when I told you when I was on the clock that I had the spill, and you absolutely done nothing…."  *Id.* at 67:19-68:6.  Thorton declared that, as opposed to Plaintiff, Timothy had communicated more information about the spill, including the chemical involved and the extent of the spill, which necessitated more urgent action and provided notice for the need for a chemical spill kit.  ECF No. 63-52, Exh. 28, Thorton Decl. ¶ 15.

**Missed Work Days and Leave Request**

On November 15, 2021, Plaintiff called off of work and requested that his leave be covered through FMLA.  *See* ECF Nos. 63-36, Exh. 12, Hours History at 84 (showing lack of hours worked on November 15, 2021); 63-35, Exh. 11, FMLA File at 4-5.  However, UPS's third party FMLA administrator, the Hartford, denied Plaintiff's request because Plaintiff failed to provide a medical

---

[14] Plaintiff later testified that this different driver was Timothy Teasley ("Timothy"), who Plaintiff believes is his third cousin.  ECF No. 67-8, Exh. 8, Pl. Dep. at 145:19-146:3.

certification. ECF No. 63-35, Exh. 11, FMLA File at 4-5. Despite the FMLA denial, Plaintiff also did not come to work on November 22, 23, and 30, 2021, which Defendants submit constitute Plaintiff falsely reported that he was taking FMLA leave.[15] ECF Nos. 63-51, Exh. 27, Farmer Decl. ¶ 29; 63-39, Exh. 15, FMLA Emails at 26-27. Without requesting FMLA leave through the Hartford again, as Plaintiff had done with his November 15, 2021 request, Plaintiff continued to miss work on December 6, 7, and 8, 2021. ECF Nos. 63-51, Exh. 27, Farmer Decl. ¶ 29; 63-39, Exh. 15, FMLA Emails at 26-27. Defendants submit that Plaintiff falsely claimed that these absences were covered as FMLA leave despite failing to submit the required request through the Hartford. ECF Nos. 63-39, Exh. 15, FMLA Emails at 26-27; 63-51, Exh. 27, Farmer Decl. ¶ 29. Before addressing Plaintiff's absenteeism, Farmer called the Hartford to check Plaintiff's FMLA leave status. ECF No. 63-51, Exh. 27, Farmer Decl. ¶ 29. Plaintiff's case manager at the Hartford stated that the only FMLA request Plaintiff made, which was for November 15, 2021, was denied, and thus Plaintiff had no approved leave. *Id.*; ECF No. 63-39, Exh. 15, FMLA Emails at 26-27. The Hartford also informed Farmer that Plaintiff's last day to request leave for that period would be December 8, 2021. ECF Nos. 63-51, Exh. 27, Farmer Decl. ¶ 29; 63-39, Exh. 15, FMLA Emails at 26-27.

On December 9, 2021, the Hartford emailed Farmer that Plaintiff's November 15, 2021, request was denied due to lack of medical certification. ECF Nos. 63-51, Exh. 27, Farmer Decl. ¶ 29; 63-39, Exh. 15, FMLA Emails at 26-27. Farmer then informed Teamsters, in its capacity as Plaintiff's representative, that Plaintiff could not return to work without a medical release given the number of days that he had been absent. ECF No. 63-51, Exh. 27, Farmer Decl. ¶ 30. Plaintiff

---

[15] Plaintiff asserts that he never lied about his need for FMLA leave or lied to Farmer about requesting FMLA leave and that, to the best of his knowledge, he applied for FMLA leave in November 2021. ECF No. 67-1, Exh. 1, Pl. Aff. ¶¶ 15, 20.

did not report to work on December 10, 11, or 13, 2021, citing FMLA usage, but Plaintiff did not actually request FMLA leave from the Hartford again until December 13, 2021. *See* ECF No. 63-35, Exh. 11, FMLA File at 7. Plaintiff never requested FMLA leave approval from the Hartford for the days that he missed on November 22, 23, and 30, and December 8, 2021. *Id.* Plaintiff came to work on December 14, 2021, with a note from his therapist. ECF No. 63-51, Exh. 27, Farmer Decl. ¶ 31.

Based on Plaintiff's self-reported inability to perform his job full time, Plaintiff's therapist certified his FMLA leave for (1) two flare ups weekly and (2) therapy appointments "as medically necessary." ECF No. 63-40, Exh. 16, The Hartford Ltr. (12-16-2021) at 2. Plaintiff, however, only had appointments with his therapist on December 15 and 21, 2021. *See* ECF No. 63-38, Exh. 14, Medical Records from Stress Management Center at 7-9. Despite his therapy appointments being only 50 minutes long (*id.*), Plaintiff took 7-8 hours of leave for each of those days. ECF No. 63-35, Exh. 11, FMLA File at 21-22. Plaintiff also missed work on December 3, 6, and 7, and reported to the Hartford that these absences were all for appointments for which there is no evidence that he had. *Id.* During another week in December, Plaintiff requested FMLA leave for flare-ups on December 13, 15, and 16. *Id.* Even after FMLA leave was approved on December 16, 2021, such approval was only for two flare ups per week.[16] ECF No. 63-40, Exh. 16, The Hartford Ltr. (12-16-2021) at 2. Therefore, several days Plaintiff missed in December were not covered by the retroactive FMLA leave approval. *Id.* Effective December 14, 2021, Farmer issued Plaintiff a warning letter for unacceptable attendance. ECF No. 63-20, Exh. 6c9, Dec. 15 Warning; 63-39, Exh. 15, FMLA Emails at 26-27.

---

[16] Although Plaintiff was instructed to contact the Hartford if he needed more time off and to follow UPS's policies for reporting leave, Plaintiff did not do so. *See* ECF No. 63-40, Exh. 16, The Hartford Ltr. (12-16-2021).

During Plaintiff's shift on December 16, 2021, Plaintiff sent a message to UPS employee Kevin Cook stating, "I am coming off the road heading back to the center." ECF No. 63-22, Exh. 6c11, Dec. 16 2021 DIAD Msg. When Plaintiff arrived back at the Anderson center, Thorton asked Plaintiff why he returned, to which Plaintiff responded that he was taking FMLA leave. ECF No. 62-25, Exh. 6c14, Feb. 11 2022 Pl. Stmt. Thorton asked Plaintiff to talk to Farmer before leaving, but Plaintiff refused. *Id.* Thorton again told Plaintiff to talk to Farmer and warned him that he could be discharged for job abandonment. ECF No. 63-52, Exh. 28, Thorton Decl. ¶ 19. Plaintiff refused again and walked off the job. *Id.*; ECF No. 62-25, Exh. 6c14, Feb. 11 2022 Pl. Stmt. Despite telling Thorton that he needed to go home, Plaintiff instead went to the Teamsters Union to print his message. ECF Nos. 63-52, Exh. 28, Thorton Decl. ¶ 19; ECF No. 62-25, Exh. 6c14, Feb. 11 2022 Pl. Stmt. Thorton reported the incident to Farmer, who issued Plaintiff a cardinal discharge for job abandonment and gross insubordination. ECF No. 63-52, Exh. 28, Thorton Decl. ¶ 19.

Also on December 16, 2022, the Hartford processed Plaintiff's pending FMLA requests, resulting in Farmer receiving seven email updates in less than two hours, approving two flare-ups per week for December. ECF No. 63-39, Exh. 15, FMLA Emails at 10-21. Plaintiff requested leave to cover December 2, 3, 6, 7, 9, 10, 13, 16, and 21, or 3.33 times per week, which Defendants submit is more than twice Plaintiff's weekly allowance. *Id.*

On December 17, 2021, Farmer met with Plaintiff and informed him that he was suspended for three days for his "no call no show" on December 15, 2021, and that he was discharged for walking off the job on December 16, 2021. [17] ECF No. 63-30, Exh. 8, Rec. #2 at 00:50-01:26,

---

[17] Farmer also sent an email to Labor Manager Thomas McCready ("McCready"), stating that he believed the partial FMLA approval "[didn't] change anything," because the discharge decision

ECF Nos. 63-21, Exh. 6c10, Dec. 20 2021 Discharge 1; 63-39, Exh. 15, FMLA Emails at 26-27. On December 20, 2021, Farmer issued Plaintiff a termination letter that included another cardinal discharge for the threat made in Farmer's office.[18] ECF No. 63-24, Exh. 6c13, Dec. 20, 2021 Term. Ltr. 2.

### Greivance Challenge to Terminations

Plaintiff challenged his October 2021 working termination and December 2021 cardinal discharges via a grievance panel hearing.[19] *See generally* ECF No. 63-43, Exh. 19, Grievance Panel Decisions. The grievance panel determination, as to the October 2021 working termination, was in UPS's favor. *Id*. at 2. Thus, Plaintiff remained discharged on account of the October 2021 working termination. The panel found in Plaintiff's favor regarding the December cardinal discharge and Plaintiff was made whole for the period in which Plaintiff was not working, December 17, 2021, to the date in which the grievance panel issued its decision, on February 23, 2022, which upheld the October termination. *Id.*

---

was based on two cardinal disciplinary violations. ECF Nos. 63-39, Exh. 15, FMLA Emails at 15; 63-51, Exh. 27, Farmer Decl. ¶¶ 32-34.

[18] After McCready reviewed the circumstances, a cardinal discharge of dishonesty was added because Plaintiff had been taking off excessive time that was either (1) not yet approved under FMLA or (2) beyond the scope of FMLA approval. ECF No. 63-53, Exh. 29, McCready Decl. ¶ 9; 63-51, Exh. 27, Farmer Decl. ¶ 32; 63-39, Exh. 15, FMLA Emails at 15, 23, 28, 30, 32; 63-24, Exh. 6c13, Dec. 20, 2021 Term. Ltr. 2. For instance, Plaintiff's doctor's appointments, even once approved under the FMLA, were only 50-minute appointments, and he was leaving for the appointment and then never returning for the rest of the day. *See* ECF No. 63-38, Exh. 14, Medical Records from Stress Management Center at 7-9 (showing that Plaintiff's appointments lasted 50 minutes). Defendants submit that these facts show that the amount of time Plaintiff was not delivering packages was dishonest under the circumstances.

[19] The Panel is composed of an equal number of UPS representatives, Teamsters representatives, and an unbiased third-party arbiter. ECF No. 63-49, Exh. 25, Hungerford Decl. ¶ 6.

**Equal Employment Opportunity Commission Charge**

On April 1, 2022, Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") complaining about his December 17, 2021, discharge. ECF No. 63-44, Exh. 20, Charge, at 4-5. The EEOC charge did not complain about the October 2021 termination, the three-day suspension on December 17, 2021, or the cardinal discharge on December 20, 2021.[20] *Id.* In the charge, Plaintiff states that he was subjected to disparate treatment on March 10, 2021, when he asserted that two other employees, who are Caucasian and younger, were being treated more favorably than Plaintiff, particularly with regard to training. *Id.* at 4. Plaintiff states that he filed a grievance to assert that he was being treated less favorably because of his age and race. *Id.* Plaintiff also states that from March 10, 2021 to December 14, 2021, he was repeatedly harassed and intimidated. *Id.* Plaintiff states that he repeatedly requested a copy of UPS's dog bite policy and that Farmer repeatedly failed to honor the request. *Id.* Plaintiff states that when he finally received a copy of the dog bite policy, it depicted an image of a person of color being bitten by a dog, which Plaintiff found racially offensive. *Id.* Plaintiff also states that after he filed a grievance regarding the dog bite policy incident, a member of the management team "flung it back at him." *Id.* In response, Plaintiff states that he filed another grievance that included what Plaintiff felt was a hostile work environment that was so severe that Plaintiff had to seek attention for his "medical condition." *Id.* Plaintiff states that further harassing conduct includes, but is not limited to: (1) refusal of requests for materials to clean up chemical spills, (2) refusal to provide a properly working DIAD board, (3) refusal to provide guidance and support that would assist him in doing his job, (4) threats of termination, (5) denied transfer requests, and (6) refusal to return his personal property. *Id.* Plaintiff stated he was subjected to such treatment because of his age, race, and in

---

[20] Defendants also note that the same is true for Plaintiff's Amended Complaint. ECF No. 19.

retaliation for having complained about race-based maltreatment as well as retaliation for requesting an accommodation for his disability. *Id.* Regarding Plaintiff's March 15, 2021 suspension, Plaintiff stated that Defendants alleged that he was insubordinate, dishonest, abandoned his job, and violated attendance policy, but Plaintiff submitted that he denied such allegations. *Id.* at 4-5. Plaintiff contends that Defendant's allegations were pretext and that he was suspended because of his age, race, disability, and in retaliation for his prior complaints of maltreatment and for requesting accommodations. *Id.* at 5. Plaintiff stated that he was discharged on December 17, 2021, and that Defendants cited gross insubordination, job abandonment, failure to follow proper methods and procedures, and violation of a "Last Chance Agreement" as reasons for such discharge. *Id.* Plaintiff again contended that the allegations were pretext and that he was instead discharged because of his age, race, disability, and in retaliation for his prior complaints of racial maltreatment and for requesting accommodation. *Id.* Plaintiff stated that he had been discriminated against because of his age (44), race (African American), and qualified disability, of which Defendants were fully aware, and in retaliation for engaging in an activity protected by the South Carolina Human Affairs Law, Title VII, ADEA, and the Americans with Disabilities Act of 1990 ("ADA"). *Id.*

## APPLICABLE LAW AND ANALYSIS

### Rule 12(c) Standard of Review

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). A motion for judgment on the pleadings pursuant to Rule 12(c) is analyzed under the same standard as a Rule 12(b)(6) motion to dismiss for failure to state a claim. *Burbach Broad. Co. of Del. v. Elkins Radio Corp.*, 278 F.3d 401, 405-06 (4th Cir. 2002). Generally, in evaluating

judgment on the pleadings, a court is limited to the contents of pleading documents, documents attached to the pleadings, and matters sufficiently incorporated by reference.[21] *See Jones v. Penn Nat. Ins. Co.*, 835 F. Supp. 2d 89, 93 (W.D.N.C. 2011); *see also A.S. Abell Co. v. Baltimore Typographical Union No. 12*, 338 F.2d 190, 193 (4th Cir.1964); Fed. R. Civ. Pro. 10(c).

"The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint." *Williams v. Preiss-Wal Pat III, LLC*, 17 F.Supp.3d 528, 531 (D.S.C. 2014) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)). Rule 8(a) sets forth a liberal pleading standard, which requires only a "short and plain statement of the claim showing the pleader is entitled to relief, in order to give the defendant fair notice of what ... the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation and internal quotation marks omitted). "In assessing the sufficiency of a complaint, [the court] assume[s] as true all its well-pleaded facts and draw[s] all reasonable inferences in favor of the plaintiff." *Nanni v. Aberdeen Marketplace, Inc.*, 878 F.3d 447, 452 (4th Cir. 2017) (citing *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009)). "[T]he facts alleged 'must be enough to raise a right to relief above the speculative level' and must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Robinson v. Am. Honda Motor Co., Inc.*, 551 F.3d

---

[21] The Court may consider Plaintiff's intake questionnaire (ECF No. 54-1) and charge (ECF No. 76-1) under Rule 12(c) review because such documents are sufficiently integral and relied upon in the Amended Complaint alleging employment discrimination and neither party questions such documents' authenticity. *See Fairfax v. CBS Corp.*, 2 F.4th 286, 292 (4th Cir. 2021); *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011). In addition, the Court may consider the South Carolina Human Affairs Commission ("SCHAC") webpages (ECF No. 76-2) and SCHAC Board Meeting Minutes (ECF No. 77-1) under Rule 12(c) review because the Court may take judicial notice of government websites and public statements. *Hanke v. United Parcel Serv., Inc.*, C/A No. 1:23-cv-02130-JRR, 2024 WL 3554973 (D. Md. July 26, 2024) ("The court may also take judicial notice of matters in the public record and publicly available information on state and federal government websites.") (citing *Chesapeake Bay Found., Inc.*, 794 F. Supp. 2d at 611).

218, 222 (4th Cir. 2009) (quoting *Twombly*, 550 U.S. at 555, 570). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

**Rule 56 Standard of Review**

Federal Rule of Civil Procedure 56 states, as to a party who has moved for summary judgment, that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, a court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. *Id.* at 324. Rather, the non-moving party must demonstrate that specific, material facts exist that give rise to a genuine issue. *Id.* Under this standard, the existence of a mere scintilla of evidence in support of a plaintiff's position is insufficient to withstand a defendant's summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more,

are insufficient to preclude the granting of the summary judgment motion. *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

**Defendants' Renewed Motion for Judgment on the Pleadings**

Defendants seek partial judgment on the pleadings as to the Title VII and ADEA claims[22] to the extent that such claims are based on discrete acts that occurred more than 300 days before Plaintiff filed his charge. ECF No. 76 at 2. Defendants argue that Plaintiff is not entitled to equitable tolling and because Plaintiff filed the EEOC charge on April 1, 2022, Plaintiff's Title VII and ADEA claims are time-barred due to lack of administrative exhaustion to the extent such claims are based on discrete-acts that occurred before June 5, 2021. *Id.* In Response, Plaintiff requests that the Court apply equitable tolling and find that the filing period should be tolled to include events that occurred within 300 days preceding the date of the intake questionnaire, January 14, 2022. ECF No. 77 at 5. Plaintiff agrees with the proposition that discrete acts of discrimination that occurred prior to June 5, 2021, may not be used to support Plaintiff's Title VII and ADEA claims, unless the Court finds that either Plaintiff's questionnaire constitutes a charge or equitable tolling applies. ECF No. 77 at 1-2.

*Intake Questionnaire*

Defendants argue that the questionnaire should not be considered a charge because Plaintiff's questionnaire is not verified and point to a portion in the preamble of the intake questionnaire form that reads, "***COMPLETION AND SUBMISSION OF THIS***

---

[22] Plaintiff's Title VII and ADEA claims are asserted in the First and Third Causes of Action. *See* ECF No. 19 ¶¶ 12-17, 25-29.

*QUESTIONNAIRE DOES NOT IMPLY OR CONSTITUTE THE FILING OF A CHARGE"*.

ECF No. 78 at 1-2.  Plaintiff argues that, in view of the holding in *Fed. Express Corp. v. Holowecki,*

552 U.S. 389 (2008) that a document is a charge if "it reasonably can be construed to request

agency action and appropriate relief on the employee's behalf[,]"  Plaintiff's questionnaire is a

charge.  ECF No. 77 at 4-5.  Plaintiff explains that he provided detailed information to support his

claims of race and age discrimination, along with a request for specific relief sought, and signed

the form which included a certification that all the information was true and factual.

       Plaintiff's reliance on *Holowecki* is not persuasive.  In *Holowecki*, the Supreme Court held

that "[i]n addition to the information required by the regulations, i.e., an allegation and the name

of the charged party, if a filing is to be deemed a charge it must be reasonably construed as a request

for the agency to take remedial action to protect the employee's rights or otherwise settle a dispute

between the employer and the employee."  552 U.S. at 402.  Furthermore, the Supreme Court

found that Holowecki requested the EEOC to act, in part, because "the completed questionnaire

… was supplemented with a detailed six-page affidavit.  At the end of the last page [of the

affidavit], [Holowecki] asked the agency to '[p]lease force Federal Express to end their age

discrimination so we can finish out our careers absent the unfairness and hostile work

environment….'"  *Id.* at 389, 405.  Based on the record, Plaintiff did not file any supplemental

affidavit or other correspondence along with his questionnaire indicating that he was requesting

agency action.  Additionally, the Supreme Court stated that the questionnaire itself did not give

rise to an inference that Holowecki requested action against Federal Express because of the design

of the form, which was not labeled a "Charge of Discrimination."  *Id.*  Rather, the Supreme Court

stated that the wording of the questionnaire suggested the opposite because the form's stated

purpose was to facilitate "pre-charge filing counseling" and to enable the agency to determine

28

whether it had jurisdiction over potential charges. *Id.* Thus, *Holowecki* does not support Plaintiff's argument that his questionnaire was a charge sufficient to alter the critical date calculated from the filing of his actual charge.

Plaintiff also relies on *Bland v. Fairfax Cnty., Va.*, 799 F. Supp. 2d 609 (E.D. Va. 2011). In *Bland*, the questionnaire form provided that "[w]hen this form constitutes the only timely written statement of allegations of employment discrimination, the Commission will … consider it to be a sufficient charge of discrimination under the relevant statute(s)." 799 F. Supp. 2d at 616. The questionnaire form also stated that its purpose "is to solicit information in an acceptable form consistent with statutory requirements to enable to Commission to act on matters within its jurisdiction." *Id.* The *Bland* court found that the language from the form was reasonably construed as a request for the agency to take remedial action or otherwise settle a dispute between the employer and employee under *Holowecki*. *Id.* at 616-17. However, courts in this District have consistently found that questionnaire forms containing identical or similar disclaimers to the disclaimer present in Plaintiff's questionnaire form cannot be reasonably construed as a charge under Title VII. *See*, *e.g.*, *Williams v. Fairfield Mem'l Hosp.*, C/A No. 0:19-cv-183-MGL-PJG, 2020 WL 2573386, at *3-5 (D.S.C. May 6, 2020) (considering *Holowecki*, 552 U.S. at 404, and finding that a SCHAC questionnaire containing an identical disclaimer to Plaintiff's instant questionnaire could not be reasonably construed as a charge under Title VII when the plaintiff did not supplement with an affidavit), *R&R adopted by* 2020 WL 2572277 (D.S.C. May 21, 2020); *Hickson v. CSX Transp., Inc.*, C/A No. 3:24-cv-1339-MGL-TER, 2025 WL 2725052, at *3 n.2 (D.S.C. July 2, 2025) (recognizing that "initial inquiry questionnaire" form containing a "conspicuous disclaimer that "[s]ubmitting this complaint does not mean you have filed a charge of discrimination … [y]ou need to file a charge if you want SCHAC to investigate your complaint

or if you want to use your employer in court[]" with the SCHAC on April 26, 2023, was similar to other questionnaires that courts have held cannot be reasonably construed as a charge under Title VII), *R&R adopted by* 2025 WL 2701747 (D.S.C. Sept. 23, 2025); *see also Green v. Wal-mart Stores, Inc.,* C/A No. 2:11-2219-RMG-BHH, 2012 WL 2048207, at *2-3 (D.S.C. May 3, 2012), *R&R adopted by* 2012 WL 2046124 (D.S.C. June 6, 2012); *Toro v. Sci. Applications Int'l Corp.*, C/A No. 2:12-1833-DCN-BM, 2012 WL 7176826, at *2 (D.S.C. Dec. 7, 2012), *R&R adopted by* 2013 WL 652568 (D.S.C. Feb. 21, 2013).  Further, absent from the record and Plaintiff's briefing is any indication that a supplementary affidavit or other written request for agency action was attached to his questionnaire.

Therefore, the questionnaire cannot be considered a charge because the questionnaire contains the express disclaimer that completing the questionnaire does not constitute the filing of a charge.  Accordingly, the filing of the questionnaire is not a charge and thus does not change the critical date, June 5, 2021, calculated from the date in which the charge was filed, April 1, 2022.

### *Equitable Tolling*

Defendants argue that Plaintiff is not entitled to equitable tolling.  Plaintiff seeks equitable tolling from the date in which he first pursued his rights – the filing of the intake questionnaire on January 14, 2022.  Plaintiff seeks equitable tolling to allow the critical date to shift from June 5, 2021, to March 20, 2021.  *See* ECF No. 77 at 5.  The effect of this shift would cause discrete act claims arising from conduct occurring between March 20, 2021, and June 5, 2021, to avoid being barred based on untimely administrative exhaustion.

Equitable tolling may be applied when a plaintiff shows that (1) he has been pursuing his rights diligently, and (2) some extraordinary circumstance stood in his way.  *Holland v. Fla.*, 560 U.S. 631, 649 (2010).  The United States Court of Appeals for the Fourth Circuit has also held that

30

"[t]he discretionary equitable tolling doctrine applies when (1) a defendant wrongfully prevents a plaintiff from asserting [his] claims, or (2) extraordinary circumstances beyond the plaintiff's control prevent [him] from filing on time." *Ott v. Md. Dep't of Pub. Safety & Corr. Servs.*, 909 F.3d 655, 660-61 (4th Cir. 2018) (quoting *Harris v. Hutchinson*, 209 F.3d 325, 330 (4th Cir. 2000)). Courts should apply "the doctrine infrequently, so that 'individualized hardship' and 'subjective notions of fair accommodation' do not 'supplant the rules of clearly drafted statutes.'" *Id.* at 661 (quoting *Harris*, 209 F.3d at 330). Generally, whether equitable tolling is warranted is not decided on a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) because review under Rule 12(c) is limited to the pleadings. *See Cocklin v. S.C. Dep't of Mental Health*, C/A No. 3:18-cv-2214-JMC-PJG, 2019 WL 13259289, at *3 (D.S.C. Apr. 4, 2019) ("Courts have observed because equitable tolling may depend on matters outside the pleadings, "it is rarely appropriate to grant a Rule 12(b)(6) motion to dismiss … if equitable tolling is at issue.") (citations omitted).

      Plaintiff submits the SCHAC Board Meeting Minutes show that the SCHAC was experiencing processing delays on account of the EEOC transitioning to a different internal software. *See* ECF No. 77-1 at 7 (showing a roughly 50% decrease in "Intakes Reviewed-Charge Formed" in January 2022); *see also id.* ("The EEOC transferred files from IMS to a new system called ARC in the middle of January, so the number of Intake cases reviewed went down significantly due to the technological issues that occurred beyond the agency's control"). On the other hand, Plaintiff has not cited case law that shows a 77-day delay in processing intake questionnaires based on an administrative agency's technical difficulties is an "extraordinary circumstance" sufficient to warrant application of equitable tolling. *See generally* ECF No. 77. In addition, Plaintiff does not show or argue that the delay is attributable to Defendants or another

party's misconduct. Defendants also submit that any administrative delay does not account for Plaintiff's untimely filing because Plaintiff submitted an intake questionnaire via letter despite a red banner that appeared on the SCHAC website during the relevant period, which contained a notice reading, "[d]ue to a national and state declared emergency, the [SCHAC] is requesting that individuals complete all paperwork electronically…." *See* ECF Nos. 76 at 7; 76-2 at 5; 54-1.

The undersigned finds that, at this stage, Plaintiff has sufficiently presented evidence to create a question of fact regarding entitlement to equitable tolling such that it cannot be decided on a Rule 12(c) motion. Therefore, in analyzing the Motion for Summary Judgement below, the Court has considered discrete acts of discrimination and retaliation that occurred within the 77-day period between March 20, 2021, and June 5, 2021.

**Defendants' Motion for Summary Judgment**

Defendants argue that they are entitled to summary judgment on all of Plaintiff's claims based on (1) Plaintiff's failure to administratively exhaust such claims,[23] (2) Plaintiff's failure to present direct evidence of discrimination and retaliation, and (3) Plaintiff's failure to properly present a claim under the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See generally* ECF No. 63-1.

---

[23] The undersigned does not address Defendants' arguments regarding administrative exhaustion. Plaintiff has alleged the same type of employment discrimination in this matter as alleged in the EEOC charge. Any differences in specific instances of conduct are "reasonably related" to the type of employment discrimination alleged and expected to follow from an investigation of such charge are considered administratively exhausted. *Smith v. First Union Nat. Bank*, 202 F.3d 234, 247-48 (4th Cir. 2000). While Defendants point to Fourth Circuit precedent and argue that many potential discrete-act claims based on specific instances of conduct are not explicitly alleged in Plaintiff's charge, colorable arguments exist as to whether those discrete-act claims are barred from consideration for lack of administrative exhaustion. *See*, *e.g.*, ECF No. 63-1 at 11-12. Plaintiff failed to make such arguments in his Response. *See generally* ECF No. 67. Nonetheless, the Court has considered the full scope of allegations made in the Amended Complaint and supported in Plaintiff's Response.

### *Race Discrimination Claims*

In the Amended Complaint, Plaintiff asserts claims[24] under Title VII and § 1981 for race discrimination in his First and Fourth Causes of Action.  *See* ECF No. 19 ¶¶ 12-17, 30-33. Defendants seek summary dismissal of these claims on the basis that Plaintiff lacks direct evidence of race discrimination, and that Plaintiff cannot meet his burden under the *McDonnell Douglas* framework.  ECF No. 63-1 at 10-17.  Plaintiff argues that he has submitted sufficient evidence of race discrimination.  ECF No. 67 at 10.

Title VII makes it unlawful for an employer to discriminate against an individual on the basis of protected categories, including race.  42 U.S.C. § 2000e *et seq*.  Section 1981 provides in part that all "persons ... shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens."  42 U.S.C. § 1981(a).  The Supreme Court has interpreted § 1981 "to forbid all racial discrimination in the making of private as well as public contracts."  *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 609 (1987) (internal quotation marks omitted).  This prohibition includes "discrimination in private employment on the basis of race."  *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459-60 (1975).  A plaintiff may prove discrimination through either of two methods: (1) direct evidence of discrimination, or (2) through the burden-shifting framework set out in *McDonnell Douglas* and its progeny.  *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223 (4th Cir. 2019).  In the argument against Defendants' Motion for Summary Judgment as to his race discrimination claims, Plaintiff provides a list of evidence without stating whether the evidence is offered as direct or circumstantial evidence of the claims.  *See* ECF No. 67 at 10-11.

---

[24] The district court dismissed Plaintiff's Title VII race discrimination claim asserted against Farmer individually in the Order ruling on the first Report and Recommendation.  ECF No. 75 at 3.  Accordingly, Plaintiff's Title VII race discrimination claim is only asserted against UPS.

### *Direct Evidence*

Plaintiff offers the following as evidence of his race discrimination claims: (1) Natasha Moss's statement that she overheard Farmer making racist remarks; (2) the dog bite pocket card; (3) Thorton's abusive conduct; (4) the "repeated" intimidation and hostile nature of communication with management evidenced by the recorded conversations with Farmer (5) being set up for failure through assignment of a new route and being refused a map in June 2021; and (6) having a preferred bid route taken away arbitrarily and given to a less senior, Caucasian employee in October 2021.  ECF No. 67 at 10-11.

"Direct evidence must be evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision.  Even if there is a statement that reflects a discriminatory attitude, it must have a nexus with the adverse employment action." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006) (citation and internal quotation marks omitted)).  The Fourth Circuit has found that "derogatory comments are direct evidence of discrimination if they are (1) 'related to the protected class of persons of which the plaintiff is a member'; (2) 'proximate in time to the complained-of adverse employment decision'; (3) 'made by an individual with authority over the employment decision at issue'; and (4) 'related to the employment decision at issue.'" *Cole v. Family Dollar Stores of Md., Inc.*, 811 F. App'x 168, 175 (4th Cir. 2020) (applying the standard in *Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374 (5th Cir. 2010)); *see Arthur v. Pet Dairy*, 593 F. App'x 211, 219 (4th Cir. 2015) (noting that the "[*Jackson*] test is consistent with our precedent, and we are content to adopt it here").

### *Moss's Statement*

Natasha Moss's statement that she overheard Farmer making racist remarks is the type of evidence properly considered as direct evidence. *See Warch*, 435 F.3d at 520. Plaintiff testified that Moss, an HR employee, overheard Farmer making racist remarks. ECF No. 67-8, Exh. 8, Pl. Dep. at 224:1-23. Specifically, Moss told Plaintiff that Farmer is "racist as hell" and that Farmer was "making racist statements and made racist comments when the drivers leave the building." *Id.* Plaintiff also testified that he did not know what Farmer specifically said. *Id.* at 224:19-23. Assuming without deciding that this statement is admissible,[25] Moss's statement regarding Farmer making racist comments and "being racist as hell" is not sufficient direct evidence for Plaintiff's claim because such racist comments are not tied to an adverse employment action. *See Warch*, 435 F.3d at 520; *Cole*, 811 F. App'x at 175. Plaintiff fails to show the specific words Farmer used, when Farmer's racist comments were made, or otherwise show how such comments are tied to any adverse employment action. *See* ECF Nos. 67 at 10-11; 67-8, Exh. 8, Pl. Dep. 224:1-23. Therefore, Plaintiff's testimony regarding Moss's statement is not direct evidence sufficient to overcome summary judgment. *See*, *e.g.*, *Harris v. Home Sales Co.*, 499 F. App'x 285, 288-291 (4th Cir. 2012) (holding that plaintiff overhearing his manager state "[t]ell that [n-word] to get to work on time" was insufficient to overcome summary judgment because "stray or isolated remarks" are insufficient to prove discrimination absent some actual relationship to the adverse employment actions under challenge).

---

[25] Defendants argue that Plaintiff's testimony about Natasha Moss's statement is inadmissible hearsay, and that Plaintiff failed to lay any foundation for any hearsay exception to apply. ECF No. 63-1 at 10. Plaintiff has not responded to this argument regarding Moss's statement's admissibility. *See generally* ECF No. 67. No affidavit or deposition testimony from Moss is in the record.

*Dog Bite Card*

The dog bite pocket card depicting a dark-skinned man being attacked by a dog, which was disseminated immediately after Plaintiff expressed concerns about delivering packages to homes with aggressive animals, does not constitute direct evidence of race discrimination.  ECF Nos. 67 at 10; 67-8, Exh. 8, Pl. Dep. 124:2-130:25.  Plaintiff fails to show how the dog bite policy evinces racial discrimination or how it is tied to an adverse employment action.  *See* ECF Nos. 67 at 10-11; 67-8, Exh. 8, Pl. Dep. 124:2-130:25.  Plaintiff also does not dispute or otherwise respond to Defendants' evidence that the dog bite policy was created in 2007 and previously distributed between 2007 and 2010.  *See* ECF No. 63-47, Exh. 23, Dog Bite Pocket Card & Metadata at 4 (showing that the file was created and last modified on October 17, 2007); *see also id.* at 5-6 (showing that a corresponding "quiz" file bearing the same clip art image was created and last modified in June 2011); ECF No. 63-51, Exh. 27, Farmer Decl. ¶ 17.  The fact that the dog bite policy was distributed after the dog attack or contained an image of a dark-skinned man being bitten by a dog on the buttocks does not objectively reflect a discriminatory attitude or demonstrate a connection to an adverse employment action.  *See Warch*, 435 F.3d at 520.

*Communications With Management*

The alleged intimidation and hostile nature of his communications with management, as exhibited by his conversations with Farmer is not direct evidence of race discrimination.  *See*, *e.g.*, ECF Nos. 63-51, Exh. 27, Farmer Decl. ¶ 25; 63-29, Exh. 7, Rec. #1; 63-30, Exh. 8, Rec. #2.  Plaintiff does not explain or cite to specific words in such conversations that evidence race discrimination.  *See generally* ECF No. 67 at 10-11.  The language used by Farmer in the recorded conversations does not present patent evidence of race discrimination.  Moreover, there is no tie between the conversations and any of the adverse employment decisions.  *See Warch*, 435 F.3d at 520.

36

### Thorton's Conduct

Thorton's conduct, such as throwing a signed grievance back at Plaintiff, refusing to respond to Plaintiff's plea for assistance with the chemical spill in his truck, and misplacing Plaintiff's airpods, are also not direct evidence of race discrimination. Not only does Plaintiff fail to tie these occurrences to race[26], but Plaintiff also fails to tie such occurrences to an adverse employment action. *See Warch*, 435 F.3d at 520.

### Bid Routes

Defendants changing Plaintiff's bid routes in June and October 2021, which were more preferable, and to which he was entitled based on his seniority, is not direct evidence of race discrimination. Plaintiff testified that his bid routes were cut and assigned, at least in part, to Davis, a white driver with lesser seniority. *See* ECF No. 67-8, Exh. 8, Pl. Dep. at 146:6-15, 148:17-2. While Plaintiff's testimony speculates that this reassignment evidenced an attempt to set him up for failure the facts that portions of his routes were cut, that such portions were assigned to a driver outside of his protected class, and that he was unfamiliar with his new route, such speculation is not sufficient direct evidence of race discrimination. Furthermore, Thorton and Farmer's failure to provide Plaintiff with a map despite providing Bowen with a map a week prior is not sufficient direct evidence of race discrimination. *Id.* at 144:15-20. Plaintiff is presenting evidence that requires a causal inference as to whether the route changes were based on racial discrimination. Furthermore, other than speculating that the reassignment was a ploy to set Plaintiff up for failure by assigning him an unfamiliar route and thus increasing the likelihood of Plaintiff being subject to discipline, Plaintiff fails to show how the reassignment ties to his termination.

---

[26] Plaintiff testified that one week prior to the chemical spill on his delivery truck, Thorton assisted Timothy with a chemical spill. Plaintiff does not state Timothy's race. ECF No. 67-8, Exh. 8, Pl. Dep. at 67:9-1, 145:19-146:3.

Based on the foregoing, the Plaintiff does not present direct evidence of race discrimination and thus must support his claims under the *McDonnell Douglas* framework.

### *McDonnell Douglas Framework*

Under the *McDonnell Douglas* burden-shifting framework, a plaintiff must first establish a prima facie case of discrimination. *Wannamaker-Amos v. Purem Novi, Inc.*, 126 F.4th 244, 256 (4th Cir. 2025) (citing *Haynes*, 922 F.3d at 223). "To do so, a plaintiff must show that (1) [he] is a member of a protected class; (2) [his] employer took an adverse action against [him]; (3) [he] had been fulfilling [his] employer's legitimate expectations at the time of the adverse action; and (4) the adverse action occurred under circumstances that raise a reasonable inference of unlawful discrimination[.]" *Id.* (citing *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 649-50 (4th Cir. 2021)). The burden of production then shifts to the employer to articulate a legitimate, non-discriminatory justification for its allegedly discriminatory action. *Id.* If the employer carries this burden, the plaintiff then must prove by a preponderance of the evidence that the neutral reasons offered by the employer "were not its true reasons, but were a pretext for discrimination." *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

The fourth element, the adverse action occurring under circumstances that raise a reasonable inference of unlawful discrimination, may be shown by comparator evidence that a member outside of the plaintiff's protected class was treated more favorably. *See, e.g.*, *Giles v. Nat'l R.R. Passenger Corp.*, 59 F.4th 696, 703 (4th Cir. 2023). "[T]o establish a valid comparator, the plaintiff must produce evidence that the plaintiff and comparator 'dealt with the same supervisor, [were] subject to the same standards and ... engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Haynes*, 922 F.3d at 223-24 (quoting *Haywood v. Locke*, 387 F. App'x

355, 359 (4th Cir. 2010); *see Addison v. CMH Homes, Inc.*, 47 F. Supp. 3d 404, 423 (D.S.C. 2014) (same), *appeal dismissed* No. 14-2166 (4th Cir. Apr. 16, 2015); *see also Lightner v. City of Wilmington, N.C.*, 545 F.3d 260, 265 (4th Cir. 2008) ("The similarity between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful."). The Fourth Circuit has found that there was a significant distinguishing factor precluding an appellant from showing circumstances giving rise to an inference of discrimination via comparator evidence when the appellant's infraction was not a single misstep but part of a larger pattern. *Irani v. Palmetto Health*, 767 F. App'x 399, 420-21 (4th Cir. 2019) ("[A] single violation presents an entirely different issue than a pattern of violations that have not been remedied despite continuous counseling.")

The first and second elements of the *McDonnell Douglas* framework are not in dispute. Plaintiff is African American and his employment was terminated. *See Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994); *Holland v. Wa. Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007). Plaintiff does not specifically make arguments on how the evidence he proffers in support of his race discrimination claims prove his claim under the *McDonnell Douglas* framework. *See generally* ECF No. 67 at 10-11.

Ultimately, Plaintiff's discharge was the result of the grievance panel upholding the October 2021 working termination notice related to Plaintiff's failure to deliver a package. *See* ECF No. 63-43, Exh. 19, Grievance Panel Decisions at 2-3 (finding that no contractual violation existed with respect to the October 2021 termination).

Defendants argue that Plaintiff fails to show the fourth element of a prima facie case of discrimination, that the October 2021 termination occurred under circumstances that raise a

reasonable inference of unlawful discrimination. *See Wannamaker-Amos*, 126 F.4th at 256. Plaintiff attempts to establish the requisite inference by comparator evidence.

### *Comparators*

#### *Burrell*

Defendants argue that Burrell's testimony does not show circumstances that raise a reasonable inference of unlawful discrimination because Burrell is not similarly situated to Plaintiff.[27]  ECF No. 63-1 at 12.  Burrell testified that during his employment as a package car driver, he has returned to the Anderson center, realized that he missed a delivery, notified his supervisor, and been told to go back and deliver the missed package himself a "handful" of times. ECF No. 67-7, Exh. 7, Burrell Dep. at 28:1-25.

Plaintiff fails to show that Burrell had a similar disciplinary history as Plaintiff had, such as agreeing to a last chance agreement or accumulating a similar amount of working termination notices prior to the missing deliveries.  *See Haynes*, 922 F.3d at 223-24; *Irani*, 767 F. App'x 399, 420-21.  Furthermore, based on the deposition excerpts in the record, Plaintiff fails to show that Burrell had the same supervisor as Plaintiff or that Burrell was not disciplined for missing such deliveries.  *See generally* ECF No. 67-7, Exh. 7, Burrell Dep. at 28-29; *see also Haynes*, 922 F.3d at 223-24.

#### *Mack*

Mack, a recently retired employee of the Anderson center, declared that he missed deliveries but was never disciplined accordingly.  *See* ECF No. 67-5, Exh. 5, Mack Aff. ¶ 6.  Not only does Plaintiff fail to show that Mack was similarly situated with respect to disciplinary history

---

[27] Burrell testified that he is "mixed" race, his mother is Caucasian, and his father is of Asian descent.  ECF No. 67-7, Exh. 7, Burrell Dep. at 29:3-11.

and being subject to a last chance agreement, but Plaintiff also fails to show that Mack is outside of Plaintiff's protected class. *See Addison*, 47 F. Supp. 3d at 423 (holding that the similarly situated employee must be outside of the plaintiff's protected class); *see also Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010) (same), *aff'd sub nom.* by 566 U.S. 30 (2012).

### *Sparks*

Sparks, another former employee, testified that he had been disciplined for missing a package, but also that it happens often and that he knew other package car drivers have missed packages. ECF No. 67-6, Exh. 6, Sparks Dep. at 17:1-25. When asked what the disciplinary action was, Sparks testified, "It ranges…. there were progressive discipline rules … in place." *Id.* at 17:12-22. Sparks explained, "If it happens every single day, then I'm sure eventually – at the end of the month, if you have missed 30 packages, yes, there's gonna be progressive discipline…. If not, something happens one or two times and you are able to fix it, then it may be a hey, do better, you know, next time, here's a warning for progressive discipline." *Id.* This suggests that depending on an individual's disciplinary history punishment for missing a package delivery could vary greatly.

Again, Plaintiff does not show whether Sparks is a member of Plaintiff's protected class, supervised by the same supervisors, or that Sparks had a similar disciplinary history to Plaintiff. *See generally* ECF No. 67; *see also* ECF No. 67-6, Exh. 6, Sparks Dep. at 17:1-25. Sparks also testified that he had been disciplined for failing to deliver a package before, which weighs against finding that Plaintiff being disciplined for the same disciplinary infraction was discriminatory. ECF No. 67-6, Exh. 6, Sparks Dep. at 17:5-22; *see Giles*, 59 F.4th at 703 (holding that the treatment must be different).

41

### Hicks

Plaintiff declared that he is aware of another UPS employee, Mike Hicks ("Hicks"), who was not disciplined for failing to deliver a package. ECF No. 67-1, Exh. 1, Pl. Aff. ¶ 11. However, Hicks was not disciplined when Mills, rather than Farmer, was the center manager. *Id*. Furthermore, Plaintiff does not reveal Hicks' race, whether Hicks was supervised by Thorton and Farmer, and whether Hicks had a similar disciplinary history to Plaintiff. *See id.*; *see generally* ECF No. 67.

Therefore, based on the foregoing, Plaintiff has failed to submit sufficient comparator evidence to show that his October 2021 termination occurred under circumstances that raise a reasonable inference of unlawful discrimination in satisfaction of the fourth element of a prima facie race discrimination claim under the *McDonnell Douglas* framework.[28]

### Other Evidence

Regarding the other occurrences that Plaintiff asserts were discriminatory, Plaintiff argues that the following constitute evidence of race discrimination: (1) the June 2021 reassignment of his bid route; (2) the October 2021 cutting of his bid route; (3) Natasha Moss's statement that Farmer made racist remarks; (4) Thorton's abusive conduct, such as throwing a signed grievance back at Plaintiff, refusing to respond to Plaintiff's plea for assistance with the chemical spill, and misplacing Plaintiff's AirPods; (4) dissemination of the dog bite pocket card; and (5) the repeated intimidation and hostile nature of communications with management. ECF No. 67 at 10-11.

---

[28] Similarly to his October 2021 working termination, Plaintiff fails to show any sufficient comparators with respect to his December 2021 discharge and does not argue as such. *See generally* ECF No. 67.

42

As discussed above, Plaintiff testified that he was reassigned from his bid route to an area in Oconee County in June 2021 and that Defendants failed to provide him with a map of the newly assigned area. ECF No. 67-8, Exh. 8, Pl. Dep. at 143:16-144:21. Plaintiff testified that he asked both Thorton and Farmer if he could have a map, to which they responded "go buy a map." *Id.* at 144:17-21. Plaintiff testified Thorton and Farmer provided Jason Bowen, a Caucasian man, with a map because he was assigned a route in Anderson with which he was not familiar. *Id.* at 144:20-25. Not being given a map is insufficient to constitute an adverse action for the purposes of a race discrimination claim. *See Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346, 359 (2024) (holding that to establish an adverse action a plaintiff must "show only some injury respecting [his] employment terms or conditions."). Plaintiff has not shown how being refused a map caused him any injury. ECF No. 67-8, Exh. 8, Pl. Dep. at 145:1-12. In addition, Plaintiff has not shown how Farmer and Thorton's failure to provide a map is connected to the route reassignment other than speculating that they were setting him up for failure by assigning him a new route without a map and thus increasing the likelihood that he would commit a violation of UPS policy. *Id.* at 143:16-146:3. Accordingly, the undersigned finds that comparing Bowen being given a map and Plaintiff not being given a map does not show that the June 2021 route reassignment occurred under circumstances that raise a reasonable inference of unlawful discrimination in satisfaction of the fourth element of a prima facie race discrimination claim under the *McDonnell Douglas* framework.

Plaintiff also testified that his Monday bid route was cut in October 2021 when an adjacent route belonging to Davis was not cut. ECF No. 67-8, Exh. 8, Pl. Dep. at 146:6-148:25. Plaintiff testified that this cut to his bid route was discriminatory because Davis took the majority of his route. *Id.* Plaintiff both fails to establish that Davis is a valid comparator or that such route being

43

cut was pretextual in light of the legitimate, nondiscriminatory justifications that Defendants provided. First, Davis is not similarly situated to Plaintiff because it is undisputed that Plaintiff refused to work with a helper unless it was confirmed that such helper had received full COVID vaccination and that Plaintiff still refused after Farmer offered Plaintiff an accommodation by proposing that the helper wear a mask for the duration of the delivery run. ECF No. 63-51, Exh. 27, Farmer Decl. ¶ 26. Plaintiff has not shown that Davis refused to work with a helper, and thus Davis is not a proper comparator permitting a reasonable inference that the cut to Plaintiff's Monday route and reassignment was discriminatory. *See Haynes*, 922 F.3d at 223-24. In addition, it is undisputed that Defendants were preparing for the peak delivery season when increased residential delivery volume necessitates the use of a helper. ECF No. 63-51, Exh. 27, Farmer Decl. ¶ 26. Plaintiff fails to show evidence of pretext with respect to this justification other than stating that in the CBA, "[s]eniority prevails at all times." ECF No. 67-8, Exh. 7, Pl. Dep. at 148:17-25. Accordingly, the undersigned finds that Plaintiff's Monday bid route being cut in October 2021 fails to raise a reasonable inference of unlawful discrimination.

Plaintiff testified that Moss told him that Farmer was "racist as hell" and that Farmer made "racist statements and made racist comments when the drivers leave the building."[29] ECF No. 67-8, Exh. 8, Pl. Dep. 224:1-23. Plaintiff also testified that he did not know what Farmer specifically said. *Id.* at 224:19-23. As discussed above, the lack of a connection to a contested employment decision and overall vagueness render Plaintiff's testimony about Moss's statement insufficient as direct evidence of race discrimination. Similarly, these deficiencies render Plaintiff's testimony regarding Moss's statement insufficient as circumstantial evidence of race discrimination. *See*

---

[29] The undersigned has not determined whether Moss's statement is admissible. *See supra* at 35 n.25.

*Hood-Wilson v. Bd. of Trs. of Cmty. Coll. of Baltimore Cnty.*, No. 24-2263, 2025 WL 3559987, at *7 (4th Cir. Dec. 12, 2025) ("Relevant factors" that may create the requisite connection between discriminatory comments in the workplace and a challenged decision by the employer include "the identity of the speaker, the nature and substance of the comments, and the temporal proximity of the comments to the challenged decision.") (citing *Wannamaker-Amos*, 126 F.4th at 260).  While Farmer is the relevant decisionmaker, Plaintiff has not shown the nature and substance of the comments or the temporal proximity of the comments to the challenged decision.  Based on the identity of the speaker alone, without any specific tie to Plaintiff or temporal connection to any adverse action, the undersigned finds that Plaintiff's testimony does not show that the adverse actions occurred under circumstances that raise a reasonable inference of unlawful discrimination in satisfaction of the fourth element of a prima facie race discrimination claim under the *McDonnell Douglas* framework.  *See, e.g.*, *Hood-Wilson*, 2025 WL 3559987, at *7 (holding that an employee failed to demonstrate discriminatory animus when the employee presented evidence that a decisionmaker made "generalized comments" about a protected class and none of the alleged remarks occurred around the time of the adverse action) (citing *Wannamaker-Amos*, 126 F.4th at 259–60).

As to the rest of Plaintiff's proffered evidence of race discrimination, the dog bite pocket card, Thorton's abusive conduct, and the nature of Plaintiff's communications with management, none of the above raise a reasonable inference of unlawful discrimination.  The dog bite pocket card does not raise an inference of race discrimination because the document was made in 2007, long before Plaintiff began working at UPS so that Defendants could not have harbored a discriminatory animus toward Plaintiff at the time that it was made.  Additionally, Farmer declared that he first saw the dog bite pocket card sometime between 2007 and 2010, and thus was

45

distributed before Plaintiff began working for UPS. *See* ECF Nos. 63-51, Exh. 27, Farmer Decl. ¶ 17; 63-6, Exh. 5, Employee History Profile at 1-2, 6. Furthermore, there is no connection between the dog bite pocket card and any adverse employment action.

Also, there is no indication that any of Thorton's abusive conduct was related to race. Throwing a signed grievance back at Plaintiff and misplacing Plaintiff's AirPods have no racial component and no bearing Plaintiff's October or December 2021 discipline. To the extent Plaintiff argues by way of comparison that Thorton providing Timothy assistance with a chemical spill evidences race discrimination, such argument fails because Plaintiff fails to show that Timothy is outside of Plaintiff's protected class. Finally, the undersigned has reviewed the recorded conversations between Plaintiff and Farmer and finds that no jury could reasonably conclude that Farmer's tone or language evinces discriminatory animus. The only mention of race is Farmer admonishing Plaintiff for creating a racially-charged hostile work environment. Accordingly, Plaintiff has not shown any evidence giving rise to a reasonable inference of unlawful discrimination.

Based on the foregoing, the undersigned finds that Plaintiff has failed to show a prima facie case of race discrimination under the *McDonnell Douglas* framework.[30] Accordingly, the undersigned recommends that the district court grant Defendants' Motion for Summary Judgment as to Plaintiff's race discrimination claims asserted under Title VII and § 1981.

---

[30] If the district court disagrees with this conclusion, then the undersigned still recommends dismissal of Plaintiff's race discrimination claims under Title VII and § 1981. As discussed below, the undersigned finds that Plaintiff fails to demonstrate that any of Defendants' offered legitimate, nondiscriminatory justifications for taking adverse actions against Plaintiff are pretextual. Therefore, even if the district court finds that Plaintiff demonstrated a prima facie case under the *McDonnell Douglas* framework, such claims would still be subject to summary dismissal.

46

### *Age Discrimination Claim*

In the Amended Complaint, Plaintiff asserts a claim under the ADEA for age discrimination in his Third Cause of Action.[31] *See* ECF No. 19 ¶¶ 25-29. The sole grounds for such claim are Defendants reassigning routes to substantially younger employees and terminating Plaintiff.[32] *Id.*

The ADEA forbids an employer "to discharge any individual or otherwise discriminate against any individual ... because of such individual's age." 29 U.S.C. § 623(a)(1). The ADEA covers individuals who are at least 40 years of age. *Id.* at § 631(a). To prevail on an ADEA claim, a plaintiff must show by direct or circumstantial evidence that age was the "but-for" cause of the challenged employment decision. *Palmer v. Liberty Univ., Inc.*, 72 F.4th 52, 63 (4th Cir. 2023) (cleaned up); *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009). "In other words, an employee cannot prevail on an age discrimination claim by showing that age was one of multiple motives for an employer's decision; the employee must prove that the employer would not have fired [him or taken some other adverse action] in the absence of age discrimination." *Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 725 (4th Cir. 2019) (citing *Gross*, 577 U.S. at 177).

A plaintiff can prove a violation of the ADEA through direct or circumstantial evidence. *Id.* at 725. The Fourth Circuit has found that "derogatory comments are direct evidence of

---

[31] The district court dismissed Plaintiff's ADEA discrimination claim asserted against Farmer individually in its Order ruling on the first Report and Recommendation. ECF No. 75 at 3. Accordingly, Plaintiff's ADEA age discrimination claim is only asserted against UPS.

[32] In the EEOC charge, Plaintiff alleges more grounds for the age discrimination claim by stating that Defendants' conduct was taken because of both his age and race. ECF No. 63-44, Exh. 20, Charge at 4-5. However, given how Plaintiff presented the ADEA claim in the Amended Complaint, the lack of arguments made in the Response, and the evidence provided only supports his claim regarding the reassigned routes and termination, the undersigned considers the ADEA claim to encompass only the reassigned routes and termination.

discrimination if they are (1) 'related to the protected class of persons of which the plaintiff is a member'; (2) 'proximate in time to the complained-of adverse employment decision'; (3) 'made by an individual with authority over the employment decision at issue'; and (4) 'related to the employment decision at issue.'" *Cole*, 811 F. App'x at 175. As discussed above, the *McDonnell Douglas* framework consists of three steps: "(1) the plaintiff must establish a prima facie case of discrimination; (2) if the plaintiff presents a prima facie case, then the burden shifts to the defendant to show a legitimate non-discriminatory or non-retaliatory reason for the adverse employment action; and (3) if the defendant shows such a reason, then the burden shifts to the plaintiff to prove that the reason is pretextual." *Sanders v. Tikras Tech. Sols. Corp.*, 725 F. App'x 228, 229 (4th Cir. 2018) (per curiam) (citing *McDonnell Douglas*, 411 U.S. at 802-04; *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016)). At the final stage, "[t]he employee must 'prove by a preponderance of the evidence that the legitimate reasons offered by the defendant-employer were not its true reasons, but were a pretext for discrimination.'" *Westmoreland*, 924 F.3d at 726 (cleaned up).

Under the *McDonnell Douglas* burden-shifting framework as applicable to an ADEA claim, a plaintiff must first show that (1) he is a member of a protected class, (2) he suffered an adverse employment action, (3) he was performing his job duties at a level that met the employer's legitimate expectations at the time of the adverse employment action, and (4) he was replaced by or treated less favorably than a "substantially younger" worker. *See Kendrick v. Carter Bank & Tr., Inc.*, No. 24-1377, 2025 WL 879703, at *6 (4th Cir. Mar. 21, 2025) (citing *Palmer*, 72 F.4th at 63); *see also McGrew v. Am. Credit Acceptance, LLC*, C/A No. 2:23-cv-05877-BHH-MHC, 2025 WL 2918078, at *6 (D.S.C. July 25, 2025), *R&R adopted by* 2025 WL 2617996 (D.S.C. Sept. 11, 2025) (citing *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 310, 313 (1996)).

48

Plaintiff offers the same evidence discussed above in support of his ADEA discrimination claim. *See* ECF No. 67 at 10-11. The only evidence with a nexus to Plaintiff's age are the June and October 2021 route modifications, which Plaintiff argues evidence age discrimination by virtue of a substantially younger employee, Davis, being treated more favorably. ECF No. 67-8, Exh. 8, Pl. Dep. at 143:16-144:14, 146:6-148:25. Such comparator evidence is not sufficient to be direct evidence of discrimination because a causal inference is required to find that the reassignments were made because of Plaintiff's age. *See Palmer*, 72 F.4th at 63 ("Direct evidence of age discrimination has been described in the employer/employee context as evidence that the employer announced, or admitted, or otherwise unmistakably indicated that age was a determining factor. In other words, the requisite direct evidence in an ADEA case is evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision.") (citations and internal quotations omitted). The evidence that Plaintiff points to as evidence regarding his ADEA claim does not contain a statement or other conduct that "unmistakably" indicates age was a determining factor. *See* ECF No. 67 at 10-11. Thus, Plaintiff's claim must be proven under the *McDonnell Douglas* framework.

### *McDonnell Douglas Framework*

As an initial matter, Plaintiff has shown, and Defendant does not dispute, that the first two elements of a prima facie age discrimination claim are satisfied. *See* ECF No. 64-1 at 30. Plaintiff is over forty years old and his employment was terminated. *See* 29 U.S.C. § 631(a) ("The prohibitions in [the ADEA] shall be limited to individuals who are at least 40 years of age."); *Kendrick*, 2025 WL 879703, at *6 (recognizing that termination is an adverse action).

The parties dispute whether Plaintiff has identified a similarly situated employee outside of the protected class who replaced Plaintiff or was treated more favorably than Plaintiff. ECF

No. 63-1 at 30. Plaintiff has not offered any evidence that he was replaced by a younger employee. *See* ECF No. 67 at 10-11. As discussed above, Plaintiff was reassigned to a new route in June 2021 and had his Monday bid route cut in October 2021. Plaintiff identifies Davis (under 40), who was treated more favorably than him with respect to these route changes. As to the June 2021 route reassignment, Plaintiff appears to testify that Farmer's decision allowed Davis to maintain a route while Plaintiff's route was cut, evinces age discrimination. *See* ECF No. 67-8, Exh. 8, Pl. Dep. at 144:3-14. As to the October 2021 Monday bid route reassignment, Plaintiff testified that Farmer's decision to cut Plaintiff's bid route and have Davis take the majority of Plaintiff's bid route evinces age discrimination. *Id.* at 146:6-15.

Defendants argue that Davis is not a proper comparator who is similarly situated to Plaintiff because Davis does not have a similar disciplinary history to Plaintiff. ECF No. 63-1 at 19. The undersigned agrees, as Plaintiff has not shown that Davis had a similar disciplinary history to Plaintiff. Disciplinary history is a relevant in the context of the route changes because as of June 2021, Plaintiff's disciplinary history was in part a result of traffic accidents and failure to follow UPS procedures, including issues in delivering to apartments and failing to shut his package car door. *See* ECF Nos. 63-8, Exh. 6a1, Accident 1 (Mar. 10); 63-9, Exh. 6a2, Accident 2 (Aug. 21); 63-11, Ex. 6b2, Accident 3 (Dec. 16); 63-14, Exh. 6c3, Apr. 9 2021 Discipline.

Furthermore, Davis and Plaintiff were not on the same route and Farmer testified that business purposes animated his decision to reassign Plaintiff. ECF No. 63-51, Exh. 27, Farmer Decl. ¶¶ 8, 23, 26. Davis and Plaintiff being on different routes confounds a finding that "but for" Plaintiff's age he would not have been reassigned because the route changes are undisputedly a result of businesses decisions that the Court does not have the purview to second guess. *Haynes*, 922 F.3d at 223.

Furthermore, in connection with the June 2021 route reassignment, Plaintiff testified he requested a map from Thorton and Farmer, who refused to give Plaintiff a map but had provided Bowen a map a week earlier. However, Plaintiff testified that Bowen is over 40 years old. *See* ECF No. 67-8, Exh. 8, Pl. Dep. 144:15-25. Thus, Bowen is not a proper comparator for the purposes of Plaintiff's age discrimination claim.

Additionally, assuming that Davis is a proper comparator who is similarly situated, Defendants have also offered legitimate, nondiscriminatory justifications for the route reassignments and Plaintiff has failed to show that such justifications are pretextual. As to the June 2021 reassignment, Defendants cite business reasons and Plaintiff has offered no evidence of pretext. Plaintiff's only explanation as to why the route reassignment was discriminatory is that Plaintiff had more seniority than Davis, who did not have his route reassigned, as well as speculation that the route reassignment was made for the purpose of increasing the likelihood Plaintiff would commit a disciplinary infraction due to his unfamiliarity with the route. This testimony does not show that but for Plaintiff's age, he would not have been reassigned. As to the October 2021 reassignment, Defendants cite Plaintiff's refusal to work with a helper, which Plaintiff does not dispute. As with the June 2021 reassignment, Plaintiff's reliance on seniority and failure to establish falsity or other circumstantial evidence showing that Defendants' justification is pretextual does not meet his burden under the *McDonnell Douglas* framework.

As to his terminations, as discussed above, Plaintiff has not identified any valid comparators with respect to age. Plaintiff has not identified a comparator outside of his protected class. *See* ECF Nos. 67-5 (showing that Mack worked at UPS for 37 years); 67-6 (failing to show Sparks' or Burrell's age).

Based on the foregoing, Plaintiff has failed to present direct evidence or evidence of a prima facie case of age discrimination under the *McDonnell Douglas* framework. Accordingly, the undersigned recommends that the district court grant Defendants' Motion for Summary Judgment as to Plaintiff's ADEA claim asserted in his Third Cause of Action.

### Retaliation Claims

In the Amended Complaint, Plaintiff asserts retaliation claims[33] under Title VII and § 1981 in the Second and Fifth Causes of Action. *See* ECF No. 19 ¶¶ 18-24, 34-38. Defendants seek summary dismissal of such claims on the basis that the Court lacks jurisdiction, the claims are barred for lack of administrative exhaustion, and the claims fail on the merits on summary judgment review. *See* ECF No. 63-1 at 26-30. Plaintiff argues that Defendants' lack of jurisdiction argument is without merit and that he has submitted sufficient evidence for his retaliation claims to survive summary judgment. *See* ECF No. 67 at 3-10.

### Lack of Jurisdiction

Defendants argue that the Court lacks jurisdiction over Plaintiff's retaliation claims because under the Taft-Hartley Act, Congress gave exclusive jurisdiction over claims involving unfair labor practices to the National Labor Relations Board ("NLRB"), and Plaintiff claims that he was retaliated against solely due to filing union grievances and in his role as union steward. ECF No. 63-1 at 27. Plaintiff contends that Defendants' argument is without merit because his claims are brought under federal statutes, and thus he did not sue to enforce the terms of the CBA. ECF No. 67 at 10.

---

[33] The district court dismissed Plaintiff's Title VII retaliation claim asserted against Farmer individually in its Order ruling on the undersigned's Report and Recommendation. ECF No. 75 at 3. Accordingly, Plaintiff's Title VII retaliation claim is only asserted against UPS.

"[A]s a general rule, neither state nor federal courts have jurisdiction over suits directly involving 'activity (which) is arguably subject to s 7 or s 8 of the Act.'" *Vaca v. Sipes*, 386 U.S. 171, 179-80 (1967) (quoting *San Diego Bldg. Trades Council, Millmen's Union, Loc. 2020 v. Garmon*, 359 U.S. 236, 245 (1959)). "This pre-emption doctrine, however, has never been rigidly applied to cases where it could not fairly be inferred that Congress intended exclusive jurisdiction to lie with NLRB …." *Id.*; *see Mack v. United Parcel Serv., Inc.*, C/A No. 24-00369-JB-N, 2025 WL 1222434, at *2 (S.D. Ala. Apr. 28, 2025) (holding that Title VII and § 1981 claims were outside the traditional scope of *Garmon* preemption because Title VII and § 1981 are federal causes of action and *Garmon* preempts state causes of action; and also recognizing that courts in the Fifth and Sixth circuits have held *Garmon* does not apply to Title VII claims); *Britt v. Grocers Supply Co.*, 978 F.2d 1441, 1446-47 (5th Cir. 1992) (holding that traditional preemption analysis does not apply in a conflict between two federal statutes and recognizing that claims under Title VII are not preempted by the NLRA) (collecting cases).

Defendants do not explain how the NLRA preempts Plaintiff's claims, other than pointing to the fact that Plaintiff chose to file grievances with Teamsters, and fail to cite to case law wherein a court in the Fourth Circuit has found a lack of subject matter jurisdiction in similar circumstances that is not an appeal of an NLRB decision. *See* ECF No. 63-1 at 27-28; *see also RGC (USA) Min. Sands, Inc. v. N.L.R.B.*, 281 F.3d 442, 445 (4th Cir. 2002) (denying RGC's "petition for review" from an order of the NLRB). Based on the foregoing, the undersigned disagrees with Defendants' argument regarding lack of subject matter jurisdiction and find that it has subject matter jurisdiction pursuant to Title VII and § 1981.

### Retaliation Claims

A plaintiff may prove that an employer took action with discriminatory or retaliatory intent through direct evidence or through the *McDonell Douglas* burden-shifting framework. *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015) (citing *McDonnell Douglas*, 411 U.S. 792). Under the burden-shifting framework, a plaintiff must first establish a prima facie case of retaliation by showing: "(1) [he] engaged in a protected activity; (2) the employer acted adversely against [him]; and (3) there was a causal connection between the protected activity and the asserted adverse action." *See Ziskie v. Mineta*, 547 F.3d 220, 229 (4th Cir. 2008) (citing *Holland*, 487 F.3d at 218 (4th Cir. 2007)). After the prima facie showing is made, "[t]he burden then shifts to the [employer] to show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason." *Foster*, 787 F.3d at 250. "If the employer makes this showing, the burden shifts back to the plaintiff to rebut the employer's evidence by demonstrating that the employer's purported nonretaliatory reasons were not its true reasons, but were a pretext for discrimination." *Id.* (internal quotation marks and citation omitted).

The parties do not dispute that Plaintiff engaged in protected activities when he made informal grievances regarding perceived race discrimination in February and March 2021. *See* ECF No. 63-1 at 28-30. The parties also do not dispute that Plaintiff suffered a materially adverse action when he was terminated. *Id.* The parties dispute whether Plaintiff has met his burden of showing a causal connection exists between Plaintiff engaging in the protected activities and his termination.

"[E]stablishing a 'causal relationship' at the prima facie stage is not an onerous burden." *Strothers v. City of Laurel*, 895 F.3d 317, 335 (4th Cir. 2018). Indeed, "very little evidence of a causal connection is required to establish a prima facie case of retaliation." *Roberts v. Glenn Indus.*

*Grp., Inc.*, 998 F.3d 111, 127 (4th Cir. 2021) (citing *Burgess v. Bowen*, 466 F. App'x 272, 283 (4th Cir. 2012)).  "A plaintiff may attempt to demonstrate that a protected activity caused an adverse action through two routes."  *Id.* at 123 (quoting *Johnson v. United Parcel Serv., Inc.*, 839 F. App'x 781, 783 (4th Cir. 2021)).  "A plaintiff may establish the existence of facts that 'suggest[ ] that the adverse action occurred because of the protected activity.'"  *Id.* at 123 (citing *Johnson*, 839 F. App'x at 783-84; *Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007) (recognizing that relevant evidence may be used to establish causation)).  Direct evidence in this context "encompasses conduct or statements that both (1) reflect directly the alleged [retaliatory] attitude, and (2) bear directly on the contested employment decision."  *Johnson*, 839 F. App'x at 783 (citing *Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 717 (4th Cir. 2013)).  "A plaintiff may also show that 'the adverse act bears sufficient temporal proximity to the protected activity.'"  *Roberts*, 998 F.3d at 123 (citing *Johnson*, 839 F. App'x at 783-84; *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001)).  "The existence of relevant facts alone, or together with temporal proximity, may be used to establish a causal connection between the protected activity and the adverse action."  *Id.* Direct evidence "'is evidence which, if believed, would prove the existence of a fact without any inference or presumptions.'"  *Walton v. Harker*, 33 F.4th 165, 171 (4th Cir. 2022) (quoting *O'Connor*, 56 F.3d at 548 (cleaned up), *rev'd on other grounds*, 517 U.S. 308 (1996)).  Direct evidence is "evidence of conduct or statements that reflect the alleged discriminatory attitude and that bear directly on the contested employment decision."  *Id.* at 176-77 (citing *Cline v. Roadway Express, Inc.*, 689 F.2d 481, 485 (4th Cir. 1982)).

Plaintiff argues that the conversation between Plaintiff and Farmer that was recorded on April 2, 2021, is direct evidence of retaliatory animus by Farmer and bears directly on Plaintiff's October 2021 termination.  ECF No. 67 at 5-6.  Plaintiff urges the Court to find that Farmer telling

Plaintiff that, "I am not going to allow you or anyone else to create a hostile or negative work environment. Okay? I'm not going to allow you to create that hostile and negative work environment for any of my employees, my management team, or myself. Will not happen[,]" (Def. Exh. 7, Rec. #1) and telling Plaintiff that Farmer needs to preserve his rights to "counter [Plaintiff's accusations] with libel and slander[,]" sent a message to Plaintiff that Farmer had the power to fire Plaintiff and that he would do so as a result of Plaintiff's engaging in protected activities and communications with other employees. ECF No. 67 at 6.

Defendants argue that Farmer did not state or even imply that he would fire Plaintiff because of any protected activity. Rather Farmer discussed the need for Plaintiff to not create a "hostile, negative work environment," by "following other avenues … in a professional manner." ECF Nos. 63-29, Def. Exh. 7, Rec. #1 at 01:19-01:32, 03:55-04:05; 70 at 2. In addition, Defendants argue that Farmer wanted Plaintiff to file grievances and EthicsPoint complaints as opposed to voicing his concerns in public and disruptive ways. ECF Nos. 63-29, Def. Exh. 7, Rec. #1 at 03:55-04:05; 70 at 2.

Defendants further argue that the recording was taken months prior to the issuance of Plaintiff's termination notices in October and December and that Farmer did not say anything that directly bears on any of Farmer's decisions to issue Plaintiff a notice of working termination or that reflects directly on any alleged retaliatory motive for Plaintiff engaging in any protected activity. ECF No. 70 at 11. In support, Defendants cite to the following cases: *Alberti v. Rector & Visitors of the Univ. of Va.*, 65 F.4th 151, 155-56 (4th Cir. 2023); *Cooper v. DeJoy*, No. 4:21-CV-00869-JD-KDW, 2022 WL 4172039, at *7 (D.S.C. June 23, 2022), *R&R adopted by* 2022 WL 4172039 (D.S.C. Sept. 13, 2022) (finding no direct evidence of retaliation where decisionmaker's remark did not bear directly on any employment decision contested by plaintiff); *Morrow v.*

*Carolina Urologic Res. Ctr., LLC*, No. 4:13-CV-695-RBH, 2014 WL 4825390, at *5 (D.S.C. Sept. 24, 2014) (rejecting plaintiff's argument there was direct evidence of intent when statement did not bear directly on employer's employment decision).

Plaintiff has not shown that the conversation between Plaintiff and Farmer on April 2, 2021, bore on Plaintiff's October 2021 termination or evidenced a retaliatory animus based on Plaintiff engaging in protected activities. First, Plaintiff's engagement in the protected activities in February 2021 is too temporally attenuated from the October and December terminations to support a causal inference based on temporal proximity alone. *See Massaro v. Fairfax Cnty.*, 95 F.4th 895, 902 (4th Cir. 2024) (holding that a roughly eighteen month time lapse between a plaintiff's protected activity and disciplinary transfer was "much too long to support a causal inference" and recognizing that in *Penley*, 876 F.3d at 656, the Fourth Circuit held eight or nine month gaps were too long to support such inference); *see also Barnhill*, 138 F.4th at 132 ("While there is not a bright-line rule instructing when temporal proximity is sufficient to establish causation, without other evidence of causation, the gap between the protected activity and the adverse employment action can generally be no longer than two months.") (citing *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 127 (4th Cir. 2021). There is roughly a seven-month gap between the recorded conversation between Plaintiff and Farmer and the October 2021 working termination notice for failure to deliver a package. *See* ECF No. 63-18, Exh. 6c7, Oct. 18 2021 Discipline (showing that the October 2021 working termination notice was issued on October 18 for the disciplinary violation occurring on October 13, 2021). There is an even longer gap between Plaintiff engaging in the protected activities and the December 2021 discharge notice. *Id.*

Plaintiff also fails to show how the conversation bears directly on his subsequent termination. Plaintiff's argument that "Farmer's words … sent a very clear message to [Plaintiff]

that [Farmer] had the power to fire him, and would do so, as a result of [Plaintiff's] protected activities and communications with other employees" cannot reasonably be based on the recorded conversation.  ECF No. 67 at 5-6.  There is no threat of termination.  *See generally* Def. Exh. 7, Rec. #1.  The only mention of termination occurred when Farmer was reading a portion of a disciplinary document against Plaintiff that stated if Plaintiff failed to follow UPS policies and the anti-harassment policy, then Plaintiff would be subject to discipline "up to and including termination." *Id.* at 5:30-06:00.  Thus, a jury could not reasonably conclude that this conversation evidences a retaliatory animus for Plaintiff opposing discrimination because Plaintiff has not shown that Farmer's statements in the conversation directly reflect a retaliatory attitude or bear directly on the contested employment decision.  *See*, *e.g.*, *Alberti v. Rector & Visitors of the Univ. of Virginia*, 65 F.4th 151, 156-157 (4th Cir. 2023) (finding comments that disparaged a research assistant's national origin made by the research assistant's supervisor months before any adverse changes to the research assistant's position were not sufficient to allege the necessary retaliatory motive and animus to establish a claim for retaliation); *compare Battle v. Wake Forest Univ. Baptist Med. Ctr.*, No. 1:21-CV-698, 2023 WL 4868458, at *16 (M.D.N.C. July 31, 2023) (finding a genuine dispute of material fact and denying summary judgment as to an employee's retaliation claim when the employee testified that her supervisors stated that she was being fired because she would not drop her EEOC charges in the same conversation in which Plaintiff was terminated).

Additionally, the temporal attenuation between such conversation and Plaintiff's termination, as well as the one-off nature of the conversation, cannot support the requisite causal inference.  *See Johnson v. United Parcel Serv., Inc.*, 839 F. App'x 781, 783 (4th Cir. 2021) ("[I]n the absence of a clear nexus with the employment decision in question, the materiality of stray or isolated remarks is substantially reduced." (quoting *Merritt v. Old Dominion Freight Line, Inc.*,

601 F.3d 289, 300 (4th Cir. 2010)) (holding that a UPS supervisor's remark that UPS made him at like a "monster" is the type of stray or isolated remark that is insufficient to establish a direct evidence claim).  Accordingly, Plaintiff must prove the retaliation claims under the *McDonnell Douglas* framework.

### *McDonnell Douglas Framework*

Under *McDonnell Douglas*, to establish a prima facie case of retaliation, a plaintiff is required to "show (1) that she engaged in protected activity; (2) that her employer took an adverse action against her; and (3) that a causal connection existed between the adverse activity and the protected action." *Jacobs*, 780 F.3d at 578 (brackets and internal quotation marks omitted). "Title VII retaliation claims must be proved according to traditional principles of but-for causation." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013); *see also Foster*, 787 F.3d at 252 ("*Nassar* does not alter the legal standard for adjudicating a *McDonnell Douglas* retaliation claim."). After the plaintiff establishes a prima facie case of retaliation, the burden of production shifts to the employer to articulate a legitimate, nonretaliatory justification for its adverse employment action. *Haynes*, 922 F.3d at 223. If the employer satisfies this burden, then the Plaintiff bears the burden "to produce evidence sufficient to create a material issue of fact as to whether [the employer's] alleged reason for firing her was not its true reason, but rather a pretext for discrimination." *Wannamaker-Amos*, 126 F.4th at 257. A plaintiff can establish pretext: (1) by "offering evidence that the employer's justification is unworthy of credence," or (2) by "adducing other forms of circumstantial evidence sufficiently probative of discrimination." *Id.* (cleaned up). Ultimately, the burden of persuasion rests with the plaintiff to show that he was subjected to retaliation for his protected activity. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 143 (2000).

### Pretext

Assuming *arguendo* that Plaintiff has demonstrated a prima facie case of retaliation, Plaintiff cannot show that the legitimate, nonretaliatory justifications for each adverse action are pretext for retaliation.  In attempting to establish pretext, Plaintiff argues that Farmer issued six working termination notices to Plaintiff in a span of less than three months for violations of UPS's methods, policies, and procedures.  ECF No. 67 at 6-7.  Plaintiff submits testimony from Jason DeFronzo ("DeFronzo"), who worked with Farmer at UPS and testified that it is "not very hard at all" to find violations of methods and procedures.[34]  ECF No. 67-4, Exh. 4, DeFronzo Dep. 140:22-41:15.  Thus, it follows that keeping Plaintiff at a terminable level of progressive discipline would not be difficult to do.  ECF No. 67 at 7.  Plaintiff further argues that once Plaintiff entered into the last chance agreement that Defendants would discharge Plaintiff for the first and slightest violation that they could find.

Plaintiff attempts to show pretext by challenging the credibility of Defendants' claim that the October 2021 working termination notice was issued because Plaintiff failed to deliver a package.  *Id.* at 8.  First, Plaintiff offers testimony showing that missing a delivery is not a rare occurrence.  ECF No. 67-5, Exh. 5, Mack Aff. ¶ 6; 67-6, Exh. 6, Sparks Dep. at 17:5-22; 67-7,

---

[34] An unsworn EEOC statement and other EEOC correspondence alleging employment discrimination against UPS and Farmer is included in DeFronzo's deposition alleging discriminatory conduct made by Farmer, particularly that Farmer targeted package car drivers who belonged to protected classes. *See* ECF No. 67-4, Exh. 4, DeFronzo Dep. at 6-16.  The Court does not consider the EEOC correspondence because they are merely unsworn allegations relating to events to which Plaintiff has not shown to have personal knowledge. *Id.*  Accordingly, the unsworn statement is insufficient as evidence on summary judgment. *See*, *e.g.*, *United States v. White*, 366 F.3d 291, 300, 302 (4th Cir. 2004) ("[a]n attorney's unsworn argument does not constitute evidence, and the Government has offered no affidavit, deposition, sworn statement, or other direct evidence that a Government agent did not make the oral promise."); *Williams v. Griffin*, 952 F.2d 820 (4th Cir. 1991) ("As a general rule, when one party files a motion for summary judgment, the non-movant cannot merely rely on matters pleaded in the complaint, but must, by factual affidavit or the like, respond to the motion."  (collecting cases).

Exh. 7, Burrell Dep. at 28:4-13. Second, Plaintiff declares that the package that had not been delivered for four days was not his responsibility. ECF No. 67-1, Exh. 1, Pl. Aff. ¶ 10. Plaintiff cites *Wannamaker-Amos* in which the Fourth Circuit noted that "an employer's extreme overreaction to a minor infraction may suggest that the relevant decisionmaker was looking for a reason to get rid of the plaintiff on discriminatory grounds." 126 F.4th at 260 (cleaned up). Plaintiff asserts that while Defendants may not think that Plaintiff's oversight was a minor infraction, a jury could conclude otherwise and make the reasonable inference that Defendants' justifications are pretext and thus find that but for Plaintiff's previous engagement in protected activities, he would not have been terminated. ECF No. 67 at 9.

"A plaintiff may establish pretext through two routes." *Wannamaker-Amos*, 126 F.4th at 257. "The first is offering evidence that the employer's justification is 'unworthy of credence.' *Wannamaker-Amos*, 126 F.4th at 257 (quoting *Reeves*, 530 U.S. at 143). "The second is adducing other forms of circumstantial evidence sufficiently probative of discrimination." *Id.* (citing *Reeves*, 530 U.S. at 147). "If the plaintiff makes either showing of pretext, the case must be decided by a trier of fact and cannot be resolved on summary judgment." *Id.* (citing *Sempowich*, 19 F.4th at 652). The Fourth Circuit has held that a plaintiff may create a question of fact as to pretext by coming forward with circumstantial evidence such as "that an employer's proffered nondiscriminatory reasons for the termination are inconsistent over time, false, or based on mistakes of fact." *Parker v. Children's Nat'l Med. Ctr., Inc.*, No. 24-1207, 2025 WL 1540954, at *5 (4th Cir. May 30, 2025) (citing *Sempowich*, 19 F.4th at 652). But, a plaintiff does not create a question of fact precluding summary judgment "by focusing on minor discrepancies that do not cast doubt on [an employer's] explanation's validity, or by raising points that are wholly irrelevant to" this determination. *Id.* (citing *Hux v. City of Newport News*, 451 F.3d 311, 315 (4th Cir. 2006)).

Plaintiff has not shown that Defendants' proffered justifications for the October 2021 working termination is pretext for retaliation. First, Plaintiff does not dispute that he failed to deliver a package. *See* ECF No. 67-1, Exh. 1, Pl. Aff. ¶ 10 ("I let [Thorton] know that there was a package on the truck that should have been delivered the previous Friday…. While [Thorton] was performing an audit of the packages on the truck, I noticed a package that should have been delivered that day but had been overlooked…."). Plaintiff only disputes whether he was responsible for delivering the package that had been on the truck for four days. *Id.* However, this dispute is not material because it does not rebut the undisputed fact that Plaintiff failed to deliver a package. *See Parker*, 2025 WL 1540954, at *5 ("A plaintiff does not create a question of fact precluding summary judgment 'by focusing on minor discrepancies that do not cast doubt on [an employer's] explanation's validity, or by raising points that are wholly irrelevant to' this determination." (citing *Hux*, 451 F.3d at 315)). Moreover, in the October 2021 working termination notice on the record, there is no mention that Plaintiff failed to deliver a package for four days, rather such document reads, "On October 11, 2021, during a check in audit completed by [Thorton] it was discovered that you failed to make an attempt on one of your packages." ECF No. 63-18, Exh. 6c7, Oct. 18 2021 Discipline.

Second, Plaintiff attempts to characterize the entire narrative of Plaintiff's disciplinary history as pretext for retaliation. However, Plaintiff does not challenge the fact that he committed each of the underlying offenses that resulted in the working termination notices issued by Farmer and ultimately entering into the last chance agreement. *See generally* ECF No. 67 at 3-10. Plaintiff also acknowledges that he had a history of disciplinary notices from Mills, his prior supervisor.[35]

---

[35] Based on a recent Fourth Circuit case that was issued after the parties filed their briefs, the undersigned also finds that Plaintiff's disciplinary history resulting from Mills' issuing disciplinary notices also weighs against finding an inference of discrimination. *See* ECF Nos. 63-7, Ex. 6a,

Third, as to the testimony by current and former UPS employees, Plaintiff has not identified a proper comparator because he fails to show that any of the witnesses were similarly situated to Plaintiff with respect to disciplinary history and being subject to a last chance agreement. *See* ECF No. 67 at 7-9. One of the witnesses even testified that he was disciplined for failing to deliver a package. ECF No. 67-6, Exh. 6, Sparks Dep. at 17:5-22.

Fourth, as to Plaintiff's reliance on *Wannamaker-Amos*, Plaintiff's disciplinary history and being subject to the last chance agreement is distinguishable in that terminating Plaintiff for failing to deliver the package is not fairly considered an "extreme overreaction to a minor infraction" warranting an inference that Farmer was looking for a reason to get rid of Plaintiff of retaliatory grounds. *See* 126 F.4th at 260. "Wannamker-Amos was never the subject of discipline during her seven years at Purem. She did not receive a single warning and had never been cited for any infractions before she was terminated." *Id.* at 261. Thus, the Fourth Circuit found that "the jury could reasonably have questioned whether firing Wannamaker-Amos for one infraction that did not require termination was such an extreme reaction as to be pretextual." *Id.* Wannamaker-Amos's disciplinary history is clearly distinguishable from Plaintiff's history, notwithstanding the last chance agreement, because Plaintiff had accumulated multiple working termination notices in less than three months. *See* ECF No. 67-1, Exh. 1, Pl. Aff. ¶ 3. Moreover, under the last chance agreement, Plaintiff agreed to follow all UPS methods, procedures, and instructions, as well as to

---

Disc. Ntcs. (pre-Sept. 2020); ECF No. 74 at 3, 5. Because Mills issued a substantial amount of disciplinary notices against Plaintiff before Farmer took over as the business manager at the Anderson center and before Plaintiff began engaging in protected activities, Plaintiff cannot establish the requisite causal connection or pretext. *See Andrews v. DeJoy*, No. 24-2218, 2026 WL 74575, at *3-5 (4th Cir. Jan. 9, 2026) (affirming summary dismissal and finding that former employee of U.S. Postal Service failed to establish a prima facie case of retaliation or show pretext when employer showed documented performance issues and significant disciplinary history prior to both a changing of the former employee's supervisor and the former employee filing an EEOC charge).

be terminated for failure to do so.  ECF No. 63-17, Exh. 6c6, Last Chance and Stlmt. Agmt. at 3.
Therefore, the inference of retaliation that the Fourth Circuit found in *Wannamaker-Amos* is not
warranted in the instant case.

Plaintiff also argues that the recorded April 2, 2021 meeting between Plaintiff and Farmer
supports a circumstantial case that Plaintiff would not have been terminated but for his complaints
of racial discrimination and harassment.  ECF No. 67 at 9.  Taken alone, or considered with the
rest of Plaintiff's argument for pretext, the recorded conversation does not evidence a retaliatory
animus and is not temporally or by its nature connected to the October 2021 working termination
notice.  *See generally* ECF No. 63-29, Ex. 7, Rec. #1.  Based on the language in the conversation,
a jury could not reasonably conclude that Farmer harbored a retaliatory animus.  *Id.*  Given Plaintiff
admitting that he failed to deliver a package and failing to show pretext in connection with the
October 2021 working termination, the April 2, 2021 conversation that occurred seven months
prior simply does not prove that Plaintiff would not been terminated because of his engaging in
protected activities.

Ultimately, Plaintiff has failed to show that but for his engaging in protected activities, he
would not have issued a termination notice on October 2021 for failing to deliver a package.[36]
Based on the foregoing, the undersigned recommends that the district court grant Defendants'
Motion for Summary Judgment as to Plaintiff's retaliation claims under Title VII and § 1981
asserted in the Second and Fifth Causes of Action.

---

[36] Plaintiff appears to abandon any discrete-act retaliation claim on the basis of the route
reassignments, but even if he hadn't, similar to Plaintiff's retaliation claims based on his
terminations, Plaintiff cannot show direct evidence of retaliation or pretext.  Accordingly, the
undersigned recommends summary dismissal of any discrete-act claims based on route
reassignments.

### FMLA Retaliation Claim

In the Amended Complaint, Plaintiff asserts an FMLA retaliation claim against Defendants based on Defendants terminating and discriminating against Plaintiff for exercising his rights under the FMLA in violation of 29 U.S.C. § 2615(a)(2). ECF No. 19 ¶¶ 45-54. Defendants argue that Plaintiff's FMLA retaliation claim is subject to summary dismissal because Plaintiff cannot prove pretext under the *McDonnell Douglas* framework, Plaintiff lied to Farmer about the need for FMLA leave on November 22, 23, and 30, Plaintiff failed to comply with the terms of his approved FMLA leave, and Plaintiff suffered no monetary loss. ECF No. 63-1 at 30-34. Plaintiff does not respond to Defendants' arguments regarding summary dismissal of the FMLA claim other than disputing Defendants' assertion that Plaintiff "falsely reported" taking FMLA leave when the record demonstrates otherwise. ECF No. 67 at 2.

Under the FMLA, it is "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). Retaliation claims are proscriptive and, therefore, employer intent is relevant. *Shipton v. Baltimore Gas & Elec. Co.*, 109 F.4th 701, 706 (4th Cir. 2024), *cert. denied*, 145 S. Ct. 774 (2024). A plaintiff can demonstrate FMLA retaliation by either (1) producing direct and indirect evidence of retaliatory animus or (2) demonstrating "intent by circumstantial evidence, which we evaluate under the framework established for Title VII cases in McDonnell Douglas." *Fry v. Rand Constr. Corp.*, 964 F.3d 239, 244 (4th Cir. 2020) (internal citation omitted). Under the McDonnell Douglas framework, an employee must make prima facie showing that: (1) he engaged in protected activity, (2) the employer took adverse action against him, and (3) adverse action was casually connected to the plaintiff's protected activity. *Shipton*, 109 F.4th at 706 (citing *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 550-51 (4th Cir. 2006). If the employee

demonstrates sufficient evidence to support a prima facie showing of retaliation, and the employer offers a non-discriminatory explanation for the termination, the employee bears the burden of establishing the employer's proffered explanation is pretext for FMLA retaliation. *Id.* (citing *Yashenko*, 446 F.3d at 550-51

Plaintiff does not offer any direct evidence of Defendants' retaliatory animus with respect to his engaging in protected activities under the FMLA. *See generally* ECF No. 67. The record also does not show any direct evidence of retaliatory animus. Rather, Plaintiff's sole arguments as to the FMLA retaliation claim contend that Plaintiff did not lie about the need for FMLA leave. ECF No. 67 at 2. Therefore, Plaintiff must establish his claim under the *McDonnell Douglas* framework. *See Fry*, 964 F.3d at 244.

Assuming that Plaintiff is able to demonstrate a prima facie case, Plaintiff fails to show that Defendants' legitimate, nonretaliatory justifications for issuing the December 17, 2021 and December 20, 2021 termination notices and consequently actually discharging Plaintiff are pretext for retaliation. The undersigned finds *Vannoy v. Fed. Rsrv. Bank of Richmond*, 827 F.3d 296 (4th Cir. 2016) particularly instructive. In *Vannoy*, the Fourth Circuit affirmed a district court's grant of summary judgment in favor of an employer because Vannoy failed to make an evidentiary showing that the employer's decision to terminate him was pretextual. 827 F.3d at 305. Similar to the instant case, the employer in *Vannoy* asserted that its legitimate, nonretaliatory reasons for terminating Vannoy included an unauthorized three-day absence during a work trip to Baltimore, Vannoy's failure to properly communicate about unscheduled absences, and Vannoy's failure to comply with management's instructions to complete a portion of a performance improvement plan form and instead leaving work and going home. *Id.* at 300, 305. Notably, Vannoy's absences and his failure to properly communicate such absences occurred in a period for which Vannoy had been

66

approved for FMLA leave. *Id.* at 299. The Fourth Circuit reasoned that because "[t]he FMLA does not prevent an employer from terminating an employee for poor performance, misconduct, or insubordinate behavior" and because Vannoy did not show evidence that he did not engage in the misconduct that the employer cited as reasons for Vannoy's termination, Vannoy failed to establish pretext. *Id.* at 304-5.

In the instant case, Defendants cited several legitimate, nonretaliatory reasons for Plaintiff's termination. First, Plaintiff was "grossly insubordinate[e]" and abandoned his job on December 16, 2021, when he came off the road, returned to the Anderson center, and failed to punch out and speak with Farmer despite Thorton instructing Plaintiff to do so. ECF Nos. 63-22, Exh. 6c10, Dec. 20, 2021 Discharge 1; 63-23; Exh. 6c12, Thorton Stmt,; 63-25, Exh. 6c14, Feb. 11, 2022 Teasley Stmt at 2. Second, Plaintiff took several unauthorized absences, including absences on November 22, 23, and 30, 2021, that Plaintiff failed to apply for FMLA for, and a "no call no show" absence on December 15, 2021. ECF Nos. 63-51, Exh. 27, Farmer Decl. ¶ 29; 63-39, Exh. 15, FMLA Emails at 26-27, 36.

Similarly to the employee in *Vannoy*, Plaintiff fails to make an evidentiary showing that he did not engage in the misconduct that form the grounds of Defendants' reasons for terminating Plaintiff. *See* ECF No. 67. Plaintiff rather solely contends that to the best of his knowledge, he applied for FMLA leave in November 2021 and that he never lied about his need for FMLA leave. *See generally* ECF No. 67; *see also* ECF No. 67-1 ¶¶ 15, 20. This declaration is insufficient to establish that Defendants' termination on the grounds of the "no call no show" absence, job abandonment, and gross insubordination were pretextual. *See Vannoy*, 827 F.3d at 299-300, 305 (finding that despite FMLA leave approval covering a relevant period, an employer's citation to Vannoy's failure to properly communicate his leave to management during that period was not

pretextual when Vannoy failed to dispute that he actually failed to properly communicate his leave and also finding that the employer's citation to Vannoy's failure to complete a portion of a form in compliance with management's instructions and going home instead was not pretextual when Vannoy failed to dispute that he actually failed to complete such form).  Moreover, given that the last chance agreement was in effect during these events, Defendants have another legitimate, nonretaliatory reason for Plaintiff's termination, as such agreement rendered any disciplinary violation grounds for discharge if just cause was found despite the CBA.  *See* ECF No. 63-21, Exh. 6c10, Dec. 20, 2021 Discharge ("Discussed at this meeting was your failure to follow methods, instructions, procedures, your job abandonment, your gross insubordination and your violation of your last chance agreement.").  Accordingly, Defendants are entitled to summary judgment on Plaintiff's FMLA retaliation claim under the *McDonnell Douglas* framework.  Based on the foregoing, the undersigned recommends that the district court grant Defendants' Motion for Summary Judgment as to Plaintiff's FMLA retaliation claim asserted in the Seventh Cause of Action.

### *Racially Hostile Work Environment Claim*

In the Amended Complaint, Plaintiff asserts a § 1981 hostile work environment claim against Defendants based on Plaintiff's race in the Sixt Cause of Action.  ECF No. 19 ¶¶ 39-44. Defendants argue that they are entitled to summary judgment because the Faragher/Ellerth defense applies and because Plaintiff cannot show that the alleged harassment was based on race or that the harassment was objectively severe or pervasive.  *See* ECF No. 63-1 at 20-26.  Plaintiff argues that the Faragher/Ellerth defense does not apply and that he has shown sufficient evidence of harassment.  *See* ECF No. 67 at 10.

### Faragher/Ellerth Defense

An employer can assert an affirmative defense for unlawful co-worker harassment. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807-08 (1998). Likewise, if a supervisor subjects a subordinate employee to unlawful harassment, but the supervisor's unlawful harassment does not culminate in tangible employment action, then the employer may also assert the affirmative defense. *See id*; *Burlington Indust. v. Ellerth*, 524 U.S. 742, 762–63, 765 (1998); *Brown v. Perry*, 184 F.3d 388, 394-97 (4th Cir. 1999); *Lissau v. S. Food Serv., Inc.*, 159 F.3d 177, 182 (4th Cir. 1998) ("Tangible employment actions, if not taken for discriminatory reasons, do not vitiate the affirmative defense. If [plaintiff's] termination did not result from a refusal to submit to [her supervisor's unlawful] harassment, then [the employer] may advance [the affirmative] defense."); *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 331 (4th Cir. 2012) (holding that a defending employer may only raise the Faragher/Ellerth affirmative defense when no tangible employment action has been taken against the complaining employee and that the court must first determine whether the employer took a tangible employment action against the employee).

The Faragher-Ellerth defense requires the employer to prove: (1) "that the employer exercised reasonable care to prevent and to correct promptly any ... harassing behavior," and (2) "that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807; *see Ellerth*, 524 U.S. at 765; *Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 264-69 (4th Cir. 2001).

Defendants argue that the defense applies because UPS has and distributes an anti-harassment policy containing a process for reporting racially harassing conduct and because Plaintiff complained of harassment through grievances and calling the ethics hotline rather than

utilizing the anti-harassment policy process. *See* ECF No. 63-1 at 20-21. Plaintiff argues that Defendants cannot show that they took reasonable care to prevent and correct management's abusive and discriminatory behavior because Farmer, as a center manager and UPS employee for over twenty years, has never been provided any training on employment discrimination policies and practices. *See* ECF Nos. 67 at 11; 67-2, Exh. 2, Farmer Dep. 45:1-46:17. Plaintiff also argues that UPS failed to take any action to cure the discriminatory and retaliatory conduct after Plaintiff notified the ethics hotline on multiple occasions. *See* ECF No. 67 at 11.

Defendants are not entitled to the Faragher/Ellerth Defense in this matter. There is a genuine dispute of material fact as to whether Defendants satisfy the second element of the Faragher/Ellerth defense, that Plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *See Faragher*, 524 U.S. at 807. Defendants argue that Plaintiff's interrogatory responses state that he complained of harassment through grievances and that he called the UPS ethics hotline on December 13, 2021. ECF Nos. 63-1 at 21. Plaintiff's interrogatory responses responsive to a question specifically asking about the "method of communicating" reports of harassment state that: "Plaintiff would refer Defendants to the grievances filed by Plaintiff" and state that Plaintiff called the "UPS ethics hotline on December 13, 2023." ECF No. 63-34, Exh. 10, Pl. ROG Resp. at 9. Under the UPS policy, harassment may be reported by reporting verbally or in writing to a supervisor or manager, and may be reported by calling the "UPS Help Line." ECF No. 63-4, Exh. 3, Anti-Harassment Policy, at 2. The record shows that Plaintiff called the "ethics hotline" on March 11, 2021, complaining of harassment based on his race. ECF No. 74 at 3, 5. The record also shows that this complaint was investigated, and that the investigation concluded with a finding that Plaintiff's complaint was "unsubstantiated." *Id.* at 7. Given that Plaintiff has shown that he did report that

he was subject to harassment via the "ethics hotline" in accordance with UPS's anti-harassment policy and that the complaint was investigated, there is, at a minimum, a genuine dispute of material fact as to whether Plaintiff unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer. Accordingly, the undersigned finds that the Faragher/Ellerth defense does not bar Plaintiff's hostile work environment claim.

### Hostile Work Environment Claim

A hostile work environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 276-77 (4th Cir. 2015) (en banc) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)) (internal quotation marks omitted). To demonstrate a hostile work environment claim, an employee must prove that (1) he experienced unwelcome conduct, (2) the conduct was based on a protected characteristic under the relevant statute, (3) the conduct was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere, and (4) the conduct is imputable to the employer. *See*, *e.g.*, *Laurent-Workman*, 54 F.4th 201, 210-12 (4th Cir. 2022); *Chapman v. Oakland Living Ctr., Inc.*, 48 F.4th 222, 228 (4th Cir. 2022); *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 207-08 (4th Cir. 2019); *Boyer-Liberto*, 786 F.3d at 277. An employee also must show that his protected characteristic was the "but for" cause of the alleged harassment. *See*, *e.g.*, *Gilliam v. S.C. Dep't of Juvenile Just.*, 474 F.3d 134, 142 (4th Cir. 2007). To determine whether conduct was sufficiently severe or pervasive to alter the employee's terms and conditions of employment and create an abusive working environment based on a protected characteristic, the court examines the allegations both subjectively and objectively. *See*, *e.g.*, *Harris*, 510 U.S. at 21-22. First, the employee must subjectively consider the conduct to

be sufficiently severe or pervasive as to alter his conditions of employment. *See*, *e.g.*, *Breeden*, 532 U.S. at 270-71; *Faragher*, 524 U.S. at 787-88; *Boyer-Liberto*, 786 F.3d at 277.  Second, a court views the conduct from the perspective of a reasonable person in the employee's position to determine whether it is objectively severe or pervasive.  *See*, *e.g.*, *Breeden*, 532 U.S. at 271; *Faragher*, 524 U.S. at 787-88; *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81-82 (1998); *Boyer-Liberto*, 786 F.3d at 277.

### Race Based Conduct

The conduct comprising Plaintiff's hostile work environment claim must be based on his race.  *See Ziskie v. Mineta*, 547 F.3d 220, 227 (4th Cir. 2008) (recognizing that harassment must be based on the protected characteristic); *Laurent-Workman*, 54 F.4th 201, 211 (4th Cir. 2022) (same); *see also Smith*, 202 F.3d at 242 (holding that "[a]n employee is harassed or otherwise discriminated against 'because of' his or her [race] if, 'but for' the employee's [race], he or she would not have been the victim of the discrimination.").

### Severe or Pervasive Harassment

Plaintiff has not shown that the alleged hostile work environment was objectively "severe or pervasive."  The "severe or pervasive" element of a hostile work environment claim "has both subjective and objective components."  *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008) (quoting *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333 (4th Cir. 2003) (en banc) (citing *Harris*, 510 U.S. at 21-22)).  First, the plaintiff must show that he "subjectively perceive[d] the environment to be abusive."  *Id.*  (citing *Harris*, 510 U.S. at 21-22).  Next, the plaintiff must demonstrate that the conduct was such that "a reasonable person in the plaintiff's position" would have found the environment objectively hostile or abusive. *Id.*  (citing *Oncale*, 523 U.S. at 81-82). This objective inquiry "is not, and by its nature cannot be, a mathematically precise test."  *Id.*

(citing *Harris*, 510 U.S. at 22). Rather, when determining whether the harassing conduct was objectively "severe or pervasive," courts must look "at all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (citing *Harris* 510 U.S. at 23; *Ocheltree*, 335 F.3d at 333). "[N]o single factor is" dispositive, *Harris*, 510 U.S. at 23, as "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed," *Oncale*, 523 U.S. at 81-82. The task then on summary judgment is to identify situations that a reasonable jury might find to be so out of the ordinary as to meet the severe or pervasive criterion. *Sunbelt Rentals, Inc.*, 521 F.3d at 315. That is, instances where the environment was pervaded with discriminatory conduct "aimed to humiliate, ridicule, or intimidate," thereby creating an abusive atmosphere. *Id.* (citing *Jennings v. Univ. of North Carolina,* 482 F.3d 686, 695 (4th Cir. 2007) (en banc)).

Defendants primarily argue that by virtue of Plaintiff's interrogatory responses, the only race-based conduct comprising the hostile work environment claim is being provided the dog bite pocket card. *See* ECF No. 63-1 at 25. Defendants also argue that the distribution of the dog bite pocket card was an isolated incident and that the image depicted on the card is not objectively offensive or severe. *Id.*

The undersigned agrees with Defendants as to the argument that the dog bite pocket card, standing alone, is insufficient evidence of severe or pervasive harassment. The dog bite pocket card is an isolated incident and is not objectively offensive. Moreover, Plaintiff's testimony that

the card was deeply offensive and humiliated him are not sufficient to create a genuine issue of material fact as to whether the card is objectively severe.

However, the analysis does not stop at examining the dog bite pocket card in isolation. In addition to the dog bite pocket card, Plaintiff points to other evidence of harassment allegedly based on race: (1) being told by Moss that she overheard Farmer making unspecified racist remarks, (2) the June 2021 and October 2021 route changes, and (3) being set up for failure by being assigned a new route without being provided a map. ECF No. 67 at 10-11. Taken together, these actions are not sufficiently severe or pervasive. The events described are isolated in nature because they are single instances of conduct such that the pattern of conduct is not sufficiently pervasive. *See Perkins v. Int'l Paper Co.*, 936 F.3d 196, 209-10 (4th Cir. 2019) (finding that evidence of racial statements made by co-workers heard by the plaintiff second-hand did not create a genuine issue of material fact on hostile work environment claim because the statements are remote in relative to each other and to the plaintiff's decision to leave the company); *see also Belton v. City of Charlotte*, 175 F. App'x 641, 656-57 (finding evidence that fellow firefighter said the n-word over twenty years before the plaintiff brought suit was isolated, remote in time, and did not permeate the plaintiff's work environment with discriminatory insult and abuse, and thus the use of the slur was insufficient to satisfy the severe or pervasive element of the plaintiff's hostile work environment claim); *Faragher*, 524 U.S. at 778 (noting that isolated incidents of abusive language will generally not meet the threshold of severity and pervasiveness). In addition, route changes occurred only twice over the course of five months and are not objectively race based.

The events described are also not sufficiently severe because such conduct did not affect the terms and conditions of Plaintiff's employment. *Barnhill*, 138 F.4th at 140 ("This high burden cannot be satisfied by claims based on 'petty slights or minor annoyances.'") (quoting *Laurent-*

*Workman*, 54 F.4th at 218).  As discussed above, the dog bite pocket card did not affect any condition of Plaintiff's employment.  The unfamiliarity caused by Plaintiff's reassignment to the new route and not being given a map after such reassignment did not affect any conditions of Plaintiff's employment to the extent necessary to sustain a hostile work environment claim. Rather, this conduct is the type of petty slight and annoyance that is not actionable.

Based on the foregoing, while the undersigned finds that Defendants have not met their burden in demonstrating that they are entitled to the Faragher/Ellerth defense, Plaintiff's racially hostile work environment claim under § 1981 should be dismissed because Plaintiff fails to show that the unwelcome conduct is based on race or sufficiently severe or pervasive as to alter the conditions of his employment and create an abusive atmosphere.  Accordingly, the undersigned recommends that the district court grant Defendants' Motion for Summary Judgment as to Plaintiff's Sixth Cause of Action asserting the racially hostile work environment claim under § 1981.

### *Defamation Claim*

In its Order, the district court agreed with the portion of the undersigned's Report and Recommendation finding that any defamation claim based on defamatory conduct occurring prior to January 12, 2022, is barred by the statute of limitations.  *See* ECF No. 75 at 3-4.  Accordingly, the only basis for Plaintiff's defamation claim is Defendants calling the police on March 15, 2022, requesting a police presence that lasted two weeks, and Mack being told by someone from UPS that the police were present because of Plaintiff.  *See id.*; *see also* ECF No. 63-1 at 34-35.  The district court also agreed with Plaintiff that the fact Plaintiff was alleged to be a threat was made known to UPS employees who worked at the Anderson center.  ECF No. 75 at 5.  Plaintiff has supported the allegations with two affidavits and the recording of the conversation that occurred

in December 2022.  *See* ECF Nos. 67-1, Exh. 1, Pl. Aff.; 67-5, Exh. 5, Mack Aff.; 63-30, Exh. 8, Rec. # 2.

The only bases for federal court jurisdiction are Plaintiff's employment discrimination claims.  *See* ECF No. 1 at 2 ("Because [Plaintiff] explicitly asserts claims under Title VII, the ADEA, § 1981, and FMLA, Defendants are entitled to remove his lawsuit to federal court based upon federal question jurisdiction. 28 U.S.C. §§ 1331 & 1441.").  If the district court accepts the recommendation as to the First through Seventh Causes of Action, then the district court should decline to exercise supplemental jurisdiction over Plaintiff's defamation claim asserted in the Eighth Cause of Action and remand that claim to state court.  *See* 28 U.S.C. § 1367(c)(3); *Henderson v. Harmon*, 102 F.4th 242, 251 (4th Cir. 2024) ("[G]enerally, when a district court dismisses all federal claims in the early stages of litigation—e.g., at the summary-judgment stage—it should decline to exercise jurisdiction over any remaining pendent state law claims . . . .").  "Among the factors that inform this discretionary determination are convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and considerations of judicial economy."  *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995).  The relevant factors weigh in favor of declining supplemental jurisdiction.  The undersigned recommends summary dismissal of all Plaintiff's claims asserting federal causes of action.  Furthermore, this matter is present before the Court upon Defendants' removal from the Court of Common Pleas 10th Judicial Circuit in Anderson County, South Carolina.  *See* ECF No. 1-1, Exh. 1, Compl. at 3.  Thus, Plaintiff's chosen forum is state court.  Accordingly, the undersigned recommends that the district court decline exercising supplemental jurisdiction over Plaintiff's defamation claim, dismiss and remand such claim to the state court.

## CONCLUSION AND RECOMMENDATION

Based on the foregoing, the undersigned recommends that the district court **GRANT** Defendants' Motion for Summary Judgment and Defendants' Motion for Judgment on the Pleadings, thereby **DISMISSING** Plaintiff's First through Seventh Causes of Action with prejudice.

The undersigned further recommends that the district court **REMAND** Plaintiff's Eighth Cause of Action asserting defamation.

**IT IS SO RECOMMENDED.**

s/William S. Brown
United States Magistrate Judge

January 14, 2026
Greenville, South Carolina

*The attention of the parties is directed to the important notice on the following page.*

77

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
250 East North Street, Suite 2300
Greenville, South Carolina 29601

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).